R————————, Plaintiff-Respondent,

v.

.E————————, Defendant-Appellant.

No. 8142.

Springfield Court of Appeals.

Missouri.

Jan. 30, 1963.

Motion for Rehearing or to Modify Overruled Feb. 27, 1963.

H. D. Green, Robert E. Hogan, West Plains, for defendant-appellant.

Horace S. Haseltine, Edmund C. Forehand, John C. Crow, Lincoln, Haseltine, Keet, Forehand & Springer, Springfield, Warren D. Welliver, Welliver, Porter & Cleaveland, Columbia, for plaintiff-respondent.

RUARK, Presiding Judge.

This is a suit under Section 452.150, R.S. Mo., V.A.M.S., brought by the mother against the father for custody of two young children. Although the pleadings are lengthy, we believe a summary will aid not only to explain the issues which were before the trial court but, also, to shorten the detailing of the voluminous evidence.

The petition (filed April 11, 1961) states: that the parties are parents of a girl child, aged three and a half years, and a boy, aged two and a third years; that the father and mother are living apart, and the father has physical possession of the children; that plaintiff was forced to turn over physical possession of such children because of her (then) physical condition, but that she is (now) a fit and proper person to have custody, and that by reason of the tender years of said children defendant is not a fit person for such purposes; and that plaintiff has an excellent home in which to provide and care for such children.

The answer of the father charged: that in the year 1959 plaintiff became afflicted with a mental disease and was confined in various institutions for treatment; that during such period defendant had custody; that *after her release from mental institutions, the plaintiff refused to return to home of defendant and live with him, although he had attempted to induce her to do so, and* *plaintiff arbitrarily and without cause continues in such refusal;* that prior to being confined for treatment, plaintiff had attempted to do great bodily harm to her children and did assault other members of the family with a knife; that by reason of these facts defendant believes *plaintiff is so unstable mentally and physically that she is not a fit person to have custody of the children for any period of time whatsoever except reasonable visitation at the home of defendant;* that on May 9, 1960, plaintiff (had) instituted a suit for divorce from defendant; that such cause was tried and plaintiff's petition was dismissed; and that the judgment in said cause bars the present action.

For reply plaintiff admitted that in the year 1959 she became afflicted with a mental disorder and was confined for treatment. During her illness the children were with defendant father a portion of the time and with plaintiff's parents a portion of the time. She denies that after her release she refused to return home and live with defendant without cause, or that defendant wanted her to do so. When she was released from the hospital, defendant had no home, and the husband made no offer to take her home but suggested instead that she get a job and go to work in order to see if she was recovered from her illness. On numerous occasions plaintiff attempted to talk with defendant concerning their problems and their future, but the only thing defendant wanted was sex. *Defendant made no offer of a home or support but only wanted plaintiff to get a job and to sleep with him.* In public, and as a fraud and sham, defendant has invited her to return home, but *repeatedly on occasions when the parties are alone and in private, defendant tells plaintiff that she is still sick and never will be well again and never will be any good to him or the children.* She has never, voluntarily, lived apart from her children. For two years defendant has refused to permit her to have temporary custody. The divorce action was instituted by her upon the advice of counsel for the

purpose of obtaining custody. Throughout the marriage defendant was unable to provide her and the children with a proper livelihood but was dependent wholly or in part upon his parents and her parents. During the marriage they were forced to spend considerable time with defendant's parents, and while they so lived they had no privacy of their own. Defendant's parents were elderly; his father was a helpless cripple; and the home was without conveniences and was improperly kept. During the period of defendant's custody, the children have been separated, one child being with defendant's sister in another home. Defendant has made it a condition of accepting plaintiff as his wife that she give up her desire for a college education. Defendant has refused to permit her to have custody of her children except when a member of his family is present. Her physician informs her the cause of her illness was the defendant's treatment of her and she has lost all respect for defendant and could not go back to him as his wife. She has a proper home for the children. She is a student; her schedule can be arranged so that she is absent from home only a few hours; and she is in a position to place the children in a nursery-kindergarten school during this time.

On trial of the issues thus raised (and on March 20, 1962), the court found, among other things, *it is obvious from the evidence that the defendant will not accept the plaintiff back into his life and into the lives of the children without reservation, and the evidence demonstrates that the plaintiff is mentally sound and well.* Custody was adjudged in the mother except for the month of July of each year and there was provision for visitation. From this judgment the father has appealed.

■ The court which heard the divorce case in November 1960 did not adjudge the custody of the children. We think that proceeding is not res judicata as to the questions involved in this case. Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458,

461; 224 Mo.App. 1107, 34 S.W.2d 712; Roberts v. Roberts, Mo.App., 292 S.W.2d 596; see S v. G, Mo.App., 298 S.W.2d 67, 75, 76.

■ The primary issue in this case is, of course, the welfare and well-being of the children. The matters principally in dispute are: (a) whether the mother has recovered from her illness and is mentally capable of caring for her children; (b) whether the mother has unreasonably and unwarrantedly refused to return to the home and whether she has really deserted her children; and, if these two questions are answered favorably to the mother, then, (c) considering all the circumstances, the surroundings, the homes in which the children will live and the persons who will be associated with them, with which parent will their welfare be best promoted. All parties bear good reputations and no question of social misconduct is involved.

As to history: Plaintiff mother and defendant father came originally from farms in South Missouri, not, however in the same immediate neighborhood. They were married in the latter part of *1955*. At the time this case was tried (March 19, *1962*), the father was twenty-six years old, the mother twenty-four. They first went to live with the defendant husband's parents. Both were ambitious; both desired a college education; both had a small amount of money; so they moved to a nearby city and enrolled in college. In March the money ran out, and this time the couple moved to the (vacant) farm home of the wife's parents. (These parents had in the meantime moved to the city.) The wife's father began supervising large construction jobs. The husband got a job under him, and so plaintiff and defendant eventually moved back to the city. From there on for several years it was a matter of frequently moving back and forth, and between farming and construction employment, with some schooling in between. The husband, however, retained, or at least attempted to retain, an interest in the farm-

ing on his parents' farm. In 1958 the husband got interested in timber-cutting and since then has worked at that, interspersed with farming.

At some time in 1956, the plaintiff wife had a miscarriage. Thereafter were born a girl child (age four at time of trial) and a boy (age three at time of trial).

In April 1959, a few months after the birth of the last child, while the parties were then living in the city and the father was working on a construction project, the mother began to experience periods of depression and anxiety. The condition worsened until she was placed in a hospital, where she was treated for two weeks. Then she was an out-patient for six to eight weeks. The trouble recurred, and in May she was back in the hospital for a few days. Then she was taken to a neurological hospital for three weeks and was dismissed and brought back to the original hospital for a few days. The husband commenced a proceeding to have her confined in the state hospital, but that proceeding was dismissed and the couple and their children moved back to the farm home of the husband's parents. This was about July 1, 1959.

As to conditions at this farm home, her testimony is the husband's father was incapacitated. There was no water in the house and no facilities for bathing. The food and the dishes were dirty. There was no privacy. The bed of her and her husband and that of his father and mother were close together and her husband was callous to this. She said he never once told her he loved her and was indifferent to her wishes and sensitivities.

About September 14, 1959, occurred what might be referred to as the gas-knife incident. The wife became deranged. There is no use rehashing the details of this incident. Plaintiff mother agrees she was deranged. Her conduct could, we suppose, be interpreted as suicidal, or dangerous to others, according to the viewpoint or prejudice of those concerned. We do *not* find any evidence of intent or attempt to harm her children as charged in the answer. They appear to have been outdoors at the time of the incident. Plaintiff was subdued by the husband's sister. The next day, September 15, 1959, plaintiff was admitted to a private hospital in North Missouri for treatment.

We pause here to report that somewhere along the line the defendant husband and the parents of the plaintiff wife "fell out." There is conflict in the testimony as to whether the disagreement first arose over the method of treatment which should be given, or as to the hospital to which she should be sent. The husband says he made application to have his wife sent to a state hospital because he had obligated himself for the other hospitalization and treatments. So defendant states, the plaintiff wife's father had discharged him from employment, and he had no money to secure private hospitalization. Whatever the cause or reason for the disagreement, we are sure that all parties acted with the best of intentions; and possibly, if the events were to occur again, a different atmosphere would prevail. The upshot of the arrangement was that plaintiff wife was taken to the private hospital in North Missouri, and from there on plaintiff's parents assumed and paid the expense of her treatment. They have supported her since. The defendant husband remained at the farm home of his parents with the children.

Plaintiff remained at the hospital until January 17, 1960, at which time she was discharged under the arrangement she would return periodically for check-up and examination. She had a married brother who lived in a college town not too far distant, and she went to him but returned periodically for check-ups during the year she was discharged. During this interval her brother took her for a trip to New Orleans. She also went to visit another brother in Washington, D. C. In May 1960 she decided to enroll in college, complete her education, and qualify for employment in social work. Her brother in the meantime

had purchased an "automatic" apartment building, and she took charge of it as manager. Her duties are to interview tenants (leases are on a yearly basis), collect rents, keep a check on installations, call a repair man if something goes wrong, and to keep the hallways and entrance clean. In return for this she receives her apartment rent free. She is now living in this apartment building and taking classes required for her degree. Her credits are such that, with continued schooling, she will graduate in the spring of 1963.

In May 1960 she filed suit for divorce on the ground of "indignities." On trial of that case her petition was dismissed.

After the plaintiff got her apartment, she began to prepare to have the children with her. She purchased a bed for the older child and a crib for the baby (now too old to use it). She has been baby sitting without pay for various people so that she may be around young children. She bought and made clothing which she sent to her children. After her divorce was dismissed, she commenced visiting the children in South Missouri at intervals. These visits were accomplished by the husband's taking the children to a neighbor's home where she would see them for several hours. The husband was always present. It is admitted that she was never permitted to have the children alone. On trial of this case, he testified that the only time she is welcome to see the children is "as long as I can observe, so that she does not get a chance to take them." "They told me before that she was cured—and I will release them *when she is well.*" The mother of the husband testified: "Q. Are you willing for her to come back there and make a home to live—if she wants to—if her and her husband can get along? A. Yes, *if she was to get well* and everything like that, it would be."

As to whether the plaintiff mother has recovered from her illness, plaintiff produced three physicians, specialists in that field of medicine, who testified that she is well and capable of caring for her children. One physician, a member of the clinic at which she was first treated, who certified her as mentally ill in 1959, examined her in October 1960 in reference to the divorce action, and again in February 1962 prior to trial of this case. He stated that at the time of the 1960 examination there was no evidence of psychosis. Her improvement had been "remarkable"; at that time she had a residue of "over-control," a reluctance concerning involvements with members of the opposite sex which was the natural result of an unsatisfactory experience with her husband; but she was competent to take care of her children. He examined her again in February 1962 and found that she demonstrated no evidence of mental illness. Based on his study of the plaintiff over a three-year period, he believes that she is normal with good resources in both intellectual and emotional spheres and no evidence of psychosis. Chances for recurrence of the illness are no greater in her than in any normal person, and she is competent to care for her two small children.

The head of the hospital in North Missouri in which plaintiff was treated testified plaintiff was discharged from the hospital January 17, 1960 as "recovered, prognosis fair." After her discharge he first saw her every two weeks, then every month or so. During the second year her visits were more social and certainly not for therapeutic treatments. The prognosis was changed to "prognosis good." He is of the opinion that she is fully capable of caring for her children and carrying a full college course. He was familiar with her emotional experiences concerning difficulties with her husband and court proceedings in which the custody of the children was involved, and he feels she is working her life out constructively and reliably. At the time of her discharge from the hospital he worked with her and the defendant husband in trying to iron out their marital problems. The husband questioned whether anyone ever recovered from a mental ill-

ness. The doctor says that she was looking forward to going home with her husband and children during this period, but the husband questioned her ability to return home. "I don't think we can directly refer to it as a precipitating factor in her illness, but after the illness started, he undoubtedly had those feelings to himself and questioned whether she could take her rightful place as a mother and a wife."

Another physician is director of the student health service, in charge of a staff of physicians including clinical psychologists and a consulting psychiatrist. He has had twenty-six years' experience in evaluating emotional and psychological problems in patients. His duties involve care and overseeing of the mental and physical health of the students. He also teaches psychology to Ph.D. candidates. When plaintiff mother enrolled at her present school, she reported her previous hospitalization; and as a result of that she was called in for an interview. Reports were also received from places where she had been in her previous illness. When he interviewed her, he saw no evidence of psychotic illness. He saw no need to assign her to the student health clinic. He saw her eleven times after that, not, however, because she needed therapy or treatment but usually because of her need for excuses from classes to see a lawyer or attend court. He has no fear of recurrence of her illness and thinks she is capable of rearing her children. She has been able to handle stresses well and still do superior work in school. She maintains a grade average of 3.45 (4.00 is the highest attainable). She is on the Dean's Honor List (average required is 2.75). She is in the top ten per cent of her class. She takes no drugs or tranquilizers.

Running through the testimony of each of these physicians we think we detect a note of admiration for the ex-patient and student, a strong belief in her courage, and a feeling that she is highly capable of rearing her children. There was no medical opinion to the contrary.

Did the plaintiff abandon the children or willfully and without cause refuse to return home? The facts are that she did not return to the home of defendant husband and his parents after her discharge from the hospital on January 17, 1960, and she did not go into the neighborhood in South Missouri to visit their children until December 26, 1960, after the trial of the divorce case and dismissal of her petition. She testified that when she was discharged from the hospital her husband came up to see her but did not offer to take her home. "* * * he told me that his family was afraid of me, and that he was afraid of me, and that the Doctors did not really know whether I was well—you know—I could not prove it.—I might be well a month or so and I would be sick again, * * *" Previous to that he had said to her, " 'why don't you get a job?' and he even said, 'why don't you get another man?' " "The only thing he tried to get me to do, was to go to a motel—there wasn't any home. No, he told me at that time that he had so many of my debts, that he could not—we talked for a long time—that we could not afford to pull for the whole family—not right now—." "What I remember best was that he was very interested in getting me to a motel."

She stated that after that she made no attempt to see the children. She admitted she had told the judge (in the divorce trial) she made no attempt to see the children "until I had proven to all that I was better —and to myself. This is a hard thing— to come out of a hospital—a mental hospital." Defendant husband denies her testimony. He said he did not tell her he did not want her to come home; that he asked her to and offered to take her home, and that she answered that the life of a farmer's wife did not fit her; that she was afraid she might get sick again; that her folks had told her that if she came back they would not come to her rescue; and, for another reason, she wanted to get well before she made a final decision, before she resumed care of the children. Later, "Q.

And didn't you tell Judge * * * in this courtroom that the only condition you would see those children out of your sight was if she would quit the (school) and give up her college education? * * * A. I told Judge * * * just during the summer months, that if she would quit her college and become acquainted with these kids that she had not seen but a few times—get adjusted—give her a chance to get adjusted to the children and the children to her, I would let her have them—and she would not quit school."

As to a place of abode for the children, plaintiff has an apartment, plan and pictures of which were offered in evidence. It has all the modern conveniences, including washing and drying facilities, and would appear to be suitable. As stated, in return for rent, she manages the apartment building. Her brother stated there is no reason she couldn't continue in this arrangement. The managerial duties are not scheduled for any certain time. He estimated that the total time required would be possibly forty hours per month. The apartment is about ten minutes' walk from the campus. At time of trial, she had classes which took three hours on Monday, Wednesday, and Friday and four hours on Tuesday and Thursday. She can schedule her classes all to be taken in the morning. She accomplishes her studying between eight and twelve at night. She investigated kindergarten and nursery school and they are available to her during the hours she spends in class. It being a college town, baby sitters are freely available. Her sister-in-law, who is a housewife, says, "We're like sisters," and testifies that she will help in this respect if needed.

As to finances, she is now supported by her parents, who say they are willing to help her out for so long as necessary. Both of her brothers have committed themselves to help her financially when and to the extent it is necessary. The members of her family appear to be financially able to comply with these commitments.

As to the ability of the defendant father to care for the children, he lives with his mother, his father having died while these troubles were going on. The farm belonged to the father. Now it apparently belongs to the mother and five or six brothers and sisters. Defendant is farming it and has some cows and machinery. They are mortgaged for about what they are worth, but defendant gets half of a milk check (proceeds from sale of milk) twice per month. He says that some of his financial difficulty is due to the fact that he has been paying off the original (not the final) expenses of his wife's illness. He appears to be energetic and willing to work and does not dissipate. Financially he does not seem to be any more secure than the plaintiff wife, although he is probably assured of a home for at least so long as his mother lives.

As to the husband's abode, it is a modest six-room farmhouse. According to the neighbors it is simple but not uncomfortable, and is clean and well kept. Up to the time of trial it had no running water or bathroom facilities, but those conveniences were in the process of being (and probably now are) installed. The children are necessarily under the immediate supervision of the grandmother, but the father helps with them when possible.

The mother complained that in her visits to the children she found them with clean outer clothes but dirty underclothes and that when she took them on her lap they smelled bad; that it is necessary for her each time to trim and clean their fingernails; that the boy at age three was still on the bottle and that he used the floor or any place to go to the toilet. She said when the children were taken to eat the husband objected to her having them wash their hands. All of the husband's evidence is that the children are healthy, happy, and intelligent. The children have a large yard to play in.

During the period commencing when plaintiff went to the hospital and up to the time the divorce suit was heard, the two

children were separated. The boy remained at the farm home with the grandmother, and the girl was kept by the husband's sister, who lived in the nearest town. Evidently the separation was discontinued and the children were reunited in the present house after some admonition or cautioning remarks of the trial judge who heard the divorce case. The mother of the defendant father is sixty-one years old, and it is conceded that she is an upright woman of unquestioned good character.

■ In determining this case the final responsibility is ours; but, although the findings of the trial court do not bind us, we regard them with considerable deference.[1] The written words in a cold record do not always convey the whole sense of meaning, depth, value, spontaneity, and sincerity as do the spoken words, with the gestures and manner accompanying them, in the sight and hearing of an experienced trial judge. Creamer v. Bivert, 214 Mo. 473, 113 S.W. 1118, 1120.

Concerning the question of whether the mother has recovered from her illness, there seems to be little question that she has. The doctors are unanimous in their opinions. The only persons who seem to doubt it now are the husband and his mother.

■ Concerning the question of whether the mother abandoned the children or unwarrantedly refused to return home, we think the evidence amply justifies the conclusion that her refusal, if it was a refusal, to return home was not unjustified but was the act of a person of strong resolve and good balance. She had just been discharged from a "mental" hospital. She had to get her feet on the ground and "prove" that she was capable in the face of rejection (her testimony) or suspicion (to be gathered from the husband's evidence). The fact that she was willing to stay away from her children until she was certain is only the evidence of a mother's willingness to sacrifice for her children's sake, even as the desperate mother before King Solomon. We think the trial court's finding that the husband is unwilling to accept her into his life and the lives of the children is entirely justified by the evidence. Undoubtedly the attitude of the defendant and his family toward the plaintiff will have its effect upon the children. Love, respect, and frequent association of the child with both parents are desirable; and conduct of one or the other, even though unconscious or unintentional, which tends to inspire fear, disrespect, hatred, shame, or contempt of the child for one of the parents is to be avoided in so far as possible. S v. G, Mo. App., 298 S.W.2d 67, and cases cited at 77.

■ As to choice of place of abode, it is true that the mother has a place where care of the children will be more convenient and probably more clean; but there are offsetting advantages in favor of a working farm home, even a very simple one: a yard to play in, fresh air, fireflies in the evening, the sound of the woodpecker in the morning, the bees alit on clover blooms, the changing of the seasons, all the interlocking forces of nature to be learned, and, occasionally, the chance to be alone. Even the so-called "hardships" of a simple farm life may have their part in the development of fortitude, self-reliance, and individuality. We would not agree to the removal of the children from their present surroundings, where they appear to be healthy and happy, merely because other surroundings may be more modern, convenient, or affluent. Irvine v. Aust, Mo.App., 193 S.W.2d 336(5). The affluence of one person or the limited means of another is not the primary factor to be considered in the award of custody. Edwards v. Engledorf, Mo.App., 192 S.W.2d 31; Morris v. McGregor, Mo.App., 269 S.W.2d 171; Ex parte Archer, Mo.App., 253 S.W. 1095, 1096.

---

1. § 510.310, R.S.Mo., V.A.M.S.; I v. B, Mo.App., 305 S.W.2d 713(8); C v. B, Mo. App., 358 S.W.2d 454(4); Birrittieri v. Swanston, Mo.App., 311 S.W.2d 364(6).

We think the deciding factor in this case is that, on the one hand, the children will be under the direct supervision and care of their mother; and, on the other hand, the hour-to-hour supervision and training of the children will, of necessity, be left in the grandmother, now in her sixties. "All else being equal," the law prefers the mother when the custody of the very young is involved.[2] Much has been written on this subject by the courts; but it is not necessary to support the rule by sentimentality or by Judaeo-Christian cultural tradition. In so far as mammalian life is concerned, nature decrees it. In the scheme of things it is usually the role of the mother to nurture, care for, and train the very young. The father's has been to procure the food and to fight off enemies and predators. Yet in raw nature it is usually the mother who, at the entrance to the den, casts her own life into the balance in the last desperate struggle for survival of her young. Infants need their mother. The mother, by reason of her age, if nothing else, is in most instances better qualified to rear small children than the grandmother. We think this conclusion is established by the rules of our Creator which set a fairly arbitrary age deadline on the bearing of children.

The judgment is affirmed.

STONE, J., concurs.

On Motion for Rehearing

PER CURIAM.

Now on this day it is ordered that the judgment of the circuit court be modified to the extent and only to the extent that the payment of support for the children in the sum of $100 per month as adjudged by the circuit court shall commence as of March 1, 1963 instead of August 3, 1962 as is provided in said judgment; but that in all other things said judgment is affirmed. Appellant's alternative motion for rehearing or to modify is overruled and costs are taxed against the appellant.

2. Abel v. Ingram, 223 Mo.App. 1087, 24 S.W.2d 1048, 1050; Armstrong v. Armstrong, Mo.App., 185 S.W.2d 845(4); Ellis v. Johnson, 218 Mo.App. 272, 260 S.W. 1010, 1012; Tomlinson v. French Institute of Notre Dame DeSion, 232 Mo. App. 597, 109 S.W.2d 73(5).