Raymond GARBEE, Plaintiff-Appellant,

v.

Patricia Ann Garbee TYREE, Defendant-Respondent.

No. 8463.

Springfield Court of Appeals.

Missouri.

Feb. 16, 1966.

Bussell, Hough & Greene, Joe C. Greene, E. Mitchell Hough, Springfield, for plaintiff appellant.

Parker F. Moon, Springfield, for defendant respondent.

RUARK, Judge.

This is another insolvable problem presented by an appeal from an order modifying custody of two boys, aged respectively five and three at the time the motion was filed, and a year older when the case was tried on its merits.

In 1962 the father, Raymond Garbee, filed suit for divorce and custody against his wife Patricia. Decree of divorce was granted the wife on her cross-bill, and custody of the two children was split between the mother and father in alternating three-month periods until (in the future) September 1, 1964, after which the father should have custody during the school months and the mother during the summer months, with reasonable rights of visitation in both parties; the father to pay twenty-five dollars per week for support while the children were in the custody of the mother. On November 15, 1963, the mother, Patricia, filed motion to modify as to custody (the contents of this motion will be described in some detail hereafter). Raymond filed answer and cross-motion to modify. The judge who had heard the issues in the divorce case having disqualified, the evidence in this case was heard by special judge, the Honorable H. A. Kelso, on August 8, 1964. Then, on application of the father, the hearing was recessed and continued until October 28, 1964, at which time it was resumed. On December 17, 1964, the court rendered its decree, the substance and effect of which was to reverse the periods of custody so the mother has the children during the school months and the father takes them during the summer months, with additional provisions for visitation and temporary custody during holidays. The father has appealed.

The transcript is replete with repeated objections and arguments of father's counsel. We will consider the technical points raised in the appellant father's brief, but first we must set forth generally the conditions as they existed at the time the divorce was granted as we gather from hither and yon in the transcript.

Here we remark that the mother was somewhat restricted in the showing of prior conditions. It is true that the judgment of a court having jurisdiction as to divorce becomes res adjudicata as to divorce; and the award of custody therein made is a conclusive adjudication in respect to the fitness and unfitness of the parents in respect *to the over-all conditions then existing*. Custody can later be changed only by proof of other further or different circumstances which call for such change. The reliance on the plain record does not always give a true picture of the conditions existing at the time of the original award. Often a number of grounds and a number of incidents are set forth in the pleadings. The trial judge does not usually make a finding of facts, and sometimes, as here, the judge who hears the motion to modify is not the one who heard the original case. Of course (in a motion to modify) the original case (and the facts involved) cannot be retried and rehashed (Derringer v. Derringer, Mo.App., 377 S.W.2d 513, 515),

but it often is necessary to permit the showing in a general and limited way of the circumstances and character of the parties as they existed at the time of decree in order to furnish a basis for determining whether there has been a material change affecting the welfare.[1] The original decree of divorce having been granted the mother on her cross-bill, it necessarily follows that she was the innocent and injured party and that the father was the wrongdoer in some one or more of the matters charged in her cross-bill. McCoy v. Briegel, Mo.App., 305 S.W.2d 29, 35. But that in itself is not the sole criterion in awarding custody. Paxton v. Paxton, Mo.App., 319 S.W.2d 280.

As to the circumstances existing at the time of the original decree: The younger boy had been born what is termed mongoloid.[2] The mother was suffering from a condition which the doctors refer to as a post-partum psychosis—a mental illness which sometimes follows the birth of a child. The father and mother were separated; she was unemployed and without means and was living with her parents in a nearby town. Her father was in the habit of getting on extended drunks and was of limited means. There is little, if any, evidence as to circumstances of the father at the time of the divorce.

One of the appellant father's assignments is error in overruling his motion to dismiss the mother's motion to modify. This motion to modify set forth allegations in respect to her remarriage, the occupation and salary of her present husband, her present living quarters, ability to maintain, support, and educate the children, attendance in church and kindergarten, and the further allegation that she had continued her medical treatment and that her present psychiatric condition was such that she was able to maintain herself at all times.

The basis of the attack is that the motion to modify did not contain any allegations of change of condition rendering "the principal custodian" unfit. We do not find in the transcript any such motion to dismiss. If there was in fact such a motion, and if the appellant intended to preserve any error because of its overruling, it was his duty to see that it was contained in the record. We do find that at the start of the trial the appellant (verbally) made what he calls a "renewal" of his motion to dismiss, and after a few pages of argument the court permitted the mother to amend her petition to insert an allegation that the modification would be for the best interests of the children. All this was after the appellant had filed his cross-motion to modify praying for full custody. In this cross-motion he made several allegations in regard to his ability to support and care for the children and concluded with the statement that "plaintiff has, without exception, demonstrated his stability and ability to care for said children and to see that they are appropriately raised in love and affection and that the defendant has consistently demonstrated to the contrary." It would seem to us that if the wife's motion did not put conditions in respect to father's fitness in issue, he himself by answering over and in his own cross-motion made such an issue. See Nunnink v. Nunnink, Mo.App., 257, S.W. 832(4).

It is true that the motion to modify is an independent proceeding and must state a "claim for relief," which necessarily involves a change of circumstances bearing on the welfare of the child. Wood v. Wood, Mo.App., 378 S.W.2d 237, 239; Wilton v. Wilton, Mo.App., 235 S.W.2d 418, 419; Olson v. Olson, Mo.App., 184 S.W.2d 768. But a child whose custody must be adjudged is in some respects a ward of the court (McCoy v. Briegel, supra, Mo.

---

1. S. v. G., Mo.App., 298 S.W.2d 67(8); Davis v. Davis, Mo.App., 192 S.W.2d 41 (6); 27 MLR 406, 428 et seq.

2. This we understand to be a type of mental retardation which is present at birth. This condition can sometimes be helped by training but cannot be cured.

App., 305 S.W.2d 29, 35), and the public has some interest (S. v. G., supra, Mo.App., 298 S.W.2d 67, 74). For this reason the courts have been inclined toward considerable liberality in construing the pleadings which involve the welfare of a child, and strict technicalities are swept aside (Gianformaggio v. Gianformaggio, Mo.App., 341 S.W.2d 293; Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458); and the welfare of a child is not to be decided upon any "legalistic presumption" (In re Shepler, Mo., 372 S.W.2d 87) for the obvious reason that a child should not be permitted to suffer because of the ineptness of one lawyer or the acumen of another. But regardless of the foregoing, we think the change of conditions over-all necessary to state a cause of action is one which calls for a change of custody, and this change of condition can apply to one or both of the parents. In some cases the change of condition is one which primarily affects one parent while that of the other is relatively unchanged.[3]

Another of appellant's technical assignments is error in permitting the mother to file an amended petition (motion to modify) and in refusing father's motion to strike the amended motion or the evidence received prior to such amendment.

On September 16, 1964, the mother filed her amended motion to modify in which she elaborated somewhat on her remarriage, the then employment of her present husband, and her home facilities. It then made allegations in respect to the father, the principal of which was that under his custody the children were frequently left with two elderly aunts and deprived of the companionship of the father, that the younger child was retarded, and that there were no adequate schools for such (retarded) children in the father's community; that such child was being treated as a helpless invalid without opportunity to advance. It then added charges against the husband such as profanity, excessive use of intoxicating liq-

uor, uncontrollable temper, and some abuse of the children. The father's motion to strike charged that such amended pleading interjected issues not theretofore presented and at variance with evidence already adduced, that the new petition interjected elements which were defectively absent in the first motion, that the father was surprised by the new matter, and that the father's *right to appeal was jeopardized* by the amendment. Trial was not resumed until October 28th, over a month after the filing. If the appellant was surprised, he had considerable time to recover from that surprise. As we have stated, the father by his own cross-motion had already put his fitness in issue.

The mother's husband had changed employment (due to the general severance of brakemen by all railroads) since the filing of the first motion. This had necessitated a change of work location and address, and the change was pleaded (see Supreme Court Rule 55.55). She had also testified as to the adverse condition of the children when received back into her custody and the particular condition of the "retarded" child and necessity for special training. (See Supreme Court Rule 55.54).

The court should be liberal in permitting amendment to pleadings. Ordinarily such is a matter at the discretion of the trial judge, and his action in allowing amendments will not be disturbed in the absence of palpable abuse. Maniaci v. Luechtefeld, Mo.App., 351 S.W.2d 798, 801; Pender v. Foeste, Mo., 329 S.W.2d 656, 659. We fail to see how such amendment substantially prejudiced the appellant either in the trial court or on appeal. It was not a departure and did not introduce a new cause of action. We say again that in cases involving the welfare of the children we are not impressed by picayunish technical objections. It is obvious that attorneys for appellant were seeking to prevent inquiry into things which might be unfavorable to

3. Gianformaggio v. Gianformaggio, supra, Mo.App., 341 S.W.2d 293; West v. West, 94 Mo.App. 683, 687, 68 S.W. 753, 754; R. v. E., Mo.App., 364 S.W.2d 821.

**198**

their client. We do not criticize them for trying, because they were representing their client; but it is the duty of the trial court, and this court, to attempt to get at the conditions which affect that welfare. We give such technical considerations short shrift.

Yet another of appellant's assignments is in reference to the testimony of one Dr. Hulstra. The contention is that the court erred in admitting the testimony of the doctor as to the present condition of the movant mother. In order to understand this, some background must be given.

It appears from the (frequent and extended) arguments and objections of counsel in the trial court that the mental condition of Patricia (the mother-movant) was a disputed matter in the trial of original divorce case. In that case the wife's counsel had agreed with husband's counsel that the wife would submit herself to examination by a physician of father's choosing and that the report of such physician would be accepted in lieu of the doctor's testimony. The mother was examined by Dr. Hulstra, a psychiatrist selected by the father's counsel. On the motion to modify, by agreement of counsel, the mother again submitted herself to Dr. Hulstra for examination. At trial of this case, her counsel called on father's counsel for the doctor's report. Father's counsel conceded there was an agreement that the mother would permit herself to be examined but denied there was an agreement that the report would be received in evidence. Furthermore, he stated he had never received the doctor's report. His statement was, "Dr. Hulstra and I on several occasions did confer about his findings but he and I finally resolved the situation to where he was going to muddle up the thing with a lot of antecedent things and we just concluded that we would just drop it and I paid his bill." The mother's counsel then obtained a copy of the questioned report from a member of the clinic with which Dr. Hulstra was associated and attempted to

read it in evidence. Father's counsel objected. The court indicated that he was not going to make a choice between the veracity of attorneys and excluded the report. The set-to as to the doctor's report occurred on September 8. Thereafter trial was recessed, continued, and again resumed on October 28, and Dr. Hulstra appeared as a witness for the mother. He testified that he had examined her on September 13, 1962, and again on December 16, 1963, at the request of father's counsel; and he had again examined her on September 26, 1964. He testified that on the first examination he found that, "it remains to be seen if the patient would be able to maintain herself when under stress." That on the first examination the mother was found to be suffering from post-partum psychosis which involved the birth of a child with a disorder, but on the later examinations he found that she had now recovered from that illness and it was not likely to recur. On these subsequent examinations he found her well-oriented and with no evidence of thinking disturbance, that she held up well under stressful circumstances, and (to use our words in lieu of more lengthy medical jargon) the wife was normal, with some slight residue of fear of men. He understood the situation in regard to the mongoloid child and emphasized the fact that such condition would require a great deal of effort and patience. He was asked if she was not suffering from any psychotic disturbances which would render her unfit to have minor children in her custody and care. The father's objection to this last question was (we think erroneously) sustained. The doctor was testifying from a paper which he said was a copy of a report dated January 2, 1964, addressed to father's counsel. He thought the original of the report had been mailed to father's counsel. He said his diagnosis was based on talking with the mother, family history, past history, present history, and present illness. He did not administer any treatment. Father moved to strike the doctor's testimony because *he was not the treating physician;*

and that is the complaint on this assignment.

The only case cited in support of this contention is Schears v. Missouri Pacific Railroad Co., Mo., 355 S.W.2d 314. The situation covered in that case is so different that we do not feel we should extend this lengthy opinion by distinguishing it. Obviously the means and methods used in diagnosis by an expert on mental illnesses are not the same as those used by a physician who undertakes to diagnose the results of an alleged traumatic injury. In this case, the very purpose of the doctor's diagnosis was to determine her mental condition. In fact, the testimony of father's counsel was that he caused the mother to be examined by Dr. Hulstra not because he was concerned with the mother's health but because "I was interested in refuting the allegation that her condition had improved." He got that diagnosis by an expert. Obviously he would have used it had it been favorable to his contention. He is now in a poor position to say that the doctor was not qualified to express an opinion; and we would be in a poor position to attempt to proscribe by judicial edict the methods used by psychiatrists in evaluating their patients and making their diagnoses. But even if the testimony of Dr. Hulstra were not competent, the result in this case would not be changed. The mother proved her recovery and return to normalcy by other medical evidence, and there was none to the contrary. A mother having been once mentally ill and then incapable of full-time custody of her children is not thereby forever debarred from custody. See Patterson v. Patterson, Mo.App., 375 S.W.2d 614; R. v. E., supra, Mo.App., 364 S.W.2d 821.

■ The final and we think the only worthwhile contention raised by the appellant is that the change of conditions affecting the welfare of the children was not such as to compel a change in custody. Even in this contention we are confronted with a technical approach which we will first dispose of. The trial court filed a short memorandum. It said in substance that he found there was nothing wrong with either of the homes and that the children might be well reared in either; however, "under the doctrine of Paxton v. Paxton, Mo.App., 319 S.W.2d 280, it would seem to me that the mother is entitled to custody of the children." His decree, however, did not give the whole custody to her. It placed custody in her during the school year. Appellant takes the reference to the Paxton case as creating a presumption in favor of the mother and then sets out to knock that presumption down by stating this is a case where the court had previously granted "principal custody" to the father, and that consequently the presumption runs the other way. In support he cites Birrittieri v. Swanston, Mo.App., 311 S.W.2d 364, and similar cases. The Paxton case holds many things (as will be noted from a mere glance at its seventeen headnotes). But we will assume that here the trial judge intended to say that both parties and both homes were suitable, but under the whole circumstances he had concluded that the children belonged with the mother. The statement that "all things being equal, the courts are more inclined to feel that the proper place for young children is with the mother" runs through all of the decisions. Of course all things never are exactly equal. What is intended is that if young children are involved and choice is difficult, then in ordinary circumstances the mother is favored. This is not a presumption of law; it is a recognized fact of life based on human experience. We agree with the remark of Bailey, a former judge of this court, "Psychology is a wonderful thing, but it cannot take the place of a mother's love. Nothing can." Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458, 463.

■ Of course, if the trial court had by its previous order found the mother "unfit" to the extent of *excluding* her from custody, there was necessarily a finding which negated any assumption that welfare of infant

children would be served by leaving them with her. We do not believe that an award *dividing* the custody (as was the original award in this case) necessarily negated the "fitness" of either party (see Patterson v. Patterson, Mo.App., 375 S.W.2d 614, 621).

But the person who seeks the change nevertheless has the burden of showing that different circumstances exist by reason of which the welfare of the children will be materially promoted and enhanced by change in custody. What are the circumstances? It was agreed that the living conditions in both the present homes are suitable. The father lives in a rural community near Billings in the home of his parents, and we believe in a wholesome atmosphere. He and his parents are of good reputation and go to church regularly. The father is regularly employed in Springfield and drives back and forth to work. He makes approximately ninety dollars per week, goes to work at three in the afternoon and gets off around eleven p.m. Sometimes after work he goes to the apartment of a girl friend and drinks coffee. Sometimes he stops on his drive back to Billings and drinks a bottle or two of beer. The grandfather has business and farm interests and is not regularly at home during the daytime. Quite obviously the regular daily burden of care of the two children is thrown on the paternal grandmother, who is in good health except for occasional headaches. However, the father has the benefit of the help of two unmarried aunts who live about a half-mile away. One of these is a fifty-seven-year-old school teacher who has had some courses in the teaching of retarded children. From "time to time" she spends some time with Jeffrey, the mongoloid, in helping him to talk; "He repeats after me," working with picture books, story books, and different things. Often, in his off hours, the father goes to his own farm a mile and a half distant from the home of his parents where he now lives and attends to his livestock and farm duties. Sometimes, when he thinks it will be safe, he takes one or both of the children with him.

The mother has remarried. At the time of her marriage, her husband was a Frisco brakeman, but he was "severed" in the general lay-off of employees with less than ten years' seniority. He now works for a life and accident insurance company in Kansas City. He has a guaranteed salary of six hundred dollars per month. However, (and this gives us pause) the present husband has two children by a former marriage. They are not in his custody, and he is paying one hundred fifty dollars per month for their support. He and the mother have purchased a mobile home which is fifty-six feet long and ten feet wide with two bedrooms. The trailer park in Kansas City where they now live has a place to play and a number of families with children, and the children, with their parents, play there. The trailer park is a neighborhood in itself. There is school and a supervised playground within two blocks. The present husband is fond of the children and wishes them to live with him and the mother as a family unit. When the children are with them, Douglas, the older boy, always asks the blessing at the table. The mother says that when the children are returned for her period of custody, the older boy seems confused and inclined to return to thumb-sucking, and the younger child makes no effort to talk until she starts working with him again.

There is conflict in the testimony as to the personal characteristics of the father. There was some evidence, from source not the mother, to indicate that he is high-tempered, impatient, and sometimes inclined to the use of profanity in the presence of the children. There has been some difficulty and unpleasantness in exchange of custody. The trial court, who heard the evidence, was in better position than we to judge the extent of the difficulty and the person who should be blamed for it. There is also some slight evidence to indicate a certain (at least outward) coldness, or perhaps we should say lack of demonstrative affection, of the father with the children. The father made the point of testifying that, during periods of custody of the mother, she had

had Jeffrey, the mongoloid, in the hospital four times, whereas it had not been necessary at all during the periods of the father's custody. Yet the evidence shows that this child suffers from physical defects in addition to his retarded condition. One trip to the hospital was necessary because he was suffering from internal bleeding; another occasion was a trip to a hospital in St. Louis to see a specialist concerning an operation on the child. This was on the advice of the local physician.

There are schools for children such as Jeffrey in Kansas City. There are not shown to be any in the vicinity of the home of the father.

In cases of this kind we defer to the judgment of the trial court as to disputed questions of fact. This because he is in a better position to judge the sincerity of the witnesses than we are. We agree with the trial court that both parties are "fit" parents. We think it clear that the mother is passionately devoted to these children. The doctor, in testifying, emphasized that patience would be a necessity in rearing the younger child. The daily care and teaching will necessarily rest in one instance on the mother, and in the other on the grandmother, with some part-time assistance from the willing great-aunt. We have no doubt that they are of the highest character. We have the special circumstance of a retarded child who will require more or less constant supervision and patience and continued special medical treatment. See Perr v. Perr, Mo.App., 205 S.W.2d 909, 913.[4] While argument can be made pro and con with good reason, we are inclined to agree with Judge Bailey that no one can take the place of the mother. It is a difficult situation, and no solution in regard to custody can be entirely satisfactory. Had the trial court decided the issues the other way, we would probably have affirmed; but he had the advantage of being able to judge intangibles which do not appear in the printed record. We therefore affirm.

STONE, P. J., and HOGAN, J., concur.

4. Custody was later changed because of disobedience and disrespectful attitude toward the court and its authority in removing child outside the jurisdiction of the court. Green v. Perr, Mo.App., 238 S.W.2d 924.