Larry **FORTUNE, Plaintiff-Respondent-Appellant,**

v.

**Carol Fortune SINCO, Defendant-Appellant-Respondent.**

Nos. 32228, 32334.

St. Louis Court of Appeals.

Missouri.

July 18, 1967.

Forgey & Sindel, St. Louis, for defendant-appellant-respondent.

Benson Cytron, House Springs, for plaintiff-respondent-appellant.

TOWNSEND, Commissioner.

Motion to modify provisions of divorce decree relating to custody of minor children was sustained and the father of children was given general custody and control. This appeal (No. 32,228) followed the overruling of mother's motion for new trial or for new judgment.

On April 10, 1962 a decree of divorce was entered by the Circuit Court of St. Louis County upon defendant wife's cross-bill after the husband withdrew his petition for divorce. The decree awarded the care, custody and control of two children, a boy and a girl, then twenty-two months and nine months of age, to the mother with temporary custody for one day per week to the father and with rights of reasonable visitation otherwise. Child support of $15.00 per week for each child was granted together with attorney's fees to the wife.

The sequence of events is best stated in terms of epochs in the lives of the children involved.

*Epoch 1*: The mother, hereinafter referred to as defendant, kept custody of the children until about December 15, 1962, when, owing to financial difficulties, she turned the children over to the father, movant herein, under terms which are the subject of dispute.

*Epoch 2*: The children continued in the custody of the movant from December, 1962, to about April 27, 1964, with intermittent visits by the mother.

*Epoch 3*: On the latter date, with the consent of movant, the defendant took the children from movant's home for an overnight stay with her. Defendant advised movant by telephone the following day that she was not returning them. Instead she took the children to Kansas City where she had taken up residence the preceding February. Under date of June 11, the defendant advised movant by letter that the children were with her in Kansas City, a fact of which he was unaware until receipt of the letter. Upon his search for them one week thereafter at the address given he was unable to find them. When he returned from Kansas City he had a call from Ralph Sinco, whom the mother later married—on June 20, 1964. A week later movant procured possession of the children in Kansas City upon paying the defendant $150, a sum which Ralph Sinco had requested that he pay her. The $150 was paid applicable as child support for the periods during which the children were with the defendant. Upon the last occasion movant told defendant that he was taking the children just for the week-end.

*Epoch 4*: Since receiving possession sometime in June, 1964, the movant has maintained the children in his home in Cedar Hill, Missouri.

Defendant testified that during *Epoch No. 1* she had no income other than the child support payments up to September, 1962, and during that period she lived with her parents. In September, 1962 she moved in with a Mr. and Mrs. Spencer and went to work for Dunkin' Donut. She states that in this time movant became delinquent in respect to six weekly payments for a total of $180; he limits his delinquencies to four weeks in July 1962 when he was in the hospital. By December 1962, defendant had lost her job with Dunkin' Donut and had accumulated obligations of about $200 for groceries and clothing. When she attempted to collect delinquent payments from movant, he told her that he also had financial troubles and suggested that he take the children to live with him as he was getting married in about two weeks.* Upon the

---

* Movant and the present Mrs. Fortune were married January 1, 1963.

advice of friends and because of her financial position, she relinquished the children to him. For the three weeks prior to delivering the children to the movant, they lived most of the time with a baby-sitter.

In *Epoch No. 2*, defendant lived with her parents for about six weeks after losing her job with Dunkin' Donut. She then moved to Chicago because "I can make more money up there and I was going to school up there." She attended American Beauty School, paying her tuition with money borrowed from a girl friend; she procured a job also as soon as she reached Chicago. She worked at Harding's Restaurant in Chicago from January to May 1963 and then for three and one half weeks at Chicago Motor Club, returning to St. Louis in June 1963. For two months thereafter she lived with her parents and then with Mr. and Mrs. Spencer until February 1964. Upon return from Chicago, defendant worked at Howard Johnson's in St. Ann for about three months and then successively at Mondello's Barber Shop and King Brothers Motel until a few days before her departure from the St. Louis area. In February 1964 she removed to Kansas City where she took employment with Villa Capri until April 1964.

While working at the barber shop defendant met Ralph Sinco, then in process of being divorced, and went out with him three or four times a week until she moved to Kansas City. By February 1964 defendant and Sinco had decided to get married. They travelled to Kansas City by separate conveyances at the same time and they took up residence in separate apartments in the same apartment house; defendant moved therefrom in three weeks.

At the hearing defendant's chief complaint related to her asserted inability readily to see the children, a difficulty which she limited to the six months period preceding her removal to Kansas City. She testified that she saw the children "Every second weekend or every weekend if they let me see them", that when she was re-

siding in Chicago she came down by train—with one exception when she drove down with friends. Upon such occasions she would keep the children with her overnight. She stated that for the six months prior to taking the children to Kansas City "I had an awful lot of trouble visiting." At times the children might be at their grandmother's and she couldn't see them. Upon at least one occasion she was told that they had other plans made. On deposition she had said: "Now I would say it started about six months ago when I started having difficulty seeing them." At the hearing the following testimony was had:

"Q As a matter of fact, you have very little trouble seeing the children; they objected taking them overnight on occasion?

A Yes, sir, they did object overnight quite a few times.

Q Did they ever tell you you could not come and visit the children in the home?

A No, unless they were at her grandmother's or out some where else.

Q Unless they had some other plans, is that correct?

A Yes, sir."

During the period of her residence in Kansas City defendant testified that she came to St. Louis every weekend to see the children but that owing to variations in her work schedule the day was not always the same and consequently movant and his wife never knew when she was coming.

The testimony of the parties is at variance as to the frequency of defendant's visits to the children and as to the circumstances. Movant characterizes her visits as occasional, at irregular periods, sometimes every two weeks, sometimes separated by six or eight weeks. Sometimes she visited them only in movant's home and on some occasions she was allowed to take the chil-

dren with her; the first time she took them overnight was in the summer of 1963. Only once did movant refuse to permit her to take them overnight—"The roads were bad. We had snow all around and she wanted to take the children to Tennessee to see her grandparents and I refused." Upon only one occasion did defendant request that movant return custody and that was done "halfheartedly" over the telephone in the summer of 1963; after discussion she agreed to leave the children with movant.

Defendant's testimony indicates that she had no difficulty of any moment in visiting her children until shortly before she took them away in April 1964. It is clear that she visited with the children in movant's home and upon occasion took them away with her. Movant's present wife testified:

"Q You ever talk to Carol, now Carol Sinco, Larry Fortune's prior wife, about her visiting the children or to have custody, take possession of the children at any time?

A You mean when she wanted to come and get them, yes, sir.

Q Yes.

A She either called the home and then Larry asked me if I could have them ready for the day she wanted them.

Q When you say if you could have them ready, would she take them over night, what did you do to get them ready?

A Usually called that afternoon and wanted to know that evening or called that evening and have them that morning and would I have them ready. I would have their suitcases packed.

Q You would pack the clothes for the children at that time so that she could take them?

A Yes, sir."

Upon the April 1964 occasion, defendant came to movant's home without prior notice and wanted to take the children overnight.

The present Mrs. Fortune was reluctant to have them go because "We had been gone all day to the doctor with the baby and the kids were tired." She communicated with movant and he finally said to let them go. As to this incident Mrs. Fortune testified:

"Q The first you knew that she wanted to take the children that day was when she came by the house?

A Yes, sir, drove up the gate and said they wanted the kids that day.

Q You said they, who? A Ralph and Carol.

Q Had she ever done that before? A No, no.

Q She usually called previously? A Yes, sir.

\* \* \* \* \* \*

Q You have any objection to Mrs. Sinco having temporary custody of the children while in your home?

A No, I have always been nice to her and Carol came to the home and gone to their room. I never said anything wrong to her.

Q Has she visited this home with the children?

A Yes, sir, all the time."

*Epoch No. 3.* Prior to her trip to St. Louis in April 1964 defendant had quit her job in Kansas City and had made tentative arrangements to move into quarters with a girl friend, take care of the latter's children while the latter worked and "help with the groceries", an arrangement which was consummated upon her return to Kansas City with her children. That arrangement continued until the end of May 1964, when in anticipation of her marriage to Sinco, defendant rented a house a week before the marriage and moved there with her children. Other events of this period have been detailed above.

After securing possession of the children in June 1964—*Epoch No. 4*—movant filed his motion, on June 23, to vacate the original custody order and to enter a new order awarding custody to him. On the following day defendant filed her motion to modify the original order by eliminating that part giving the father temporary custody for one day per week and by restricting the father's rights to the right of visitation at reasonable times only.

There is some evidence that in the early part of August, 1964 movant at first refused to let defendant see the children but that, after consultation with his attorney, she was permitted to visit them at movant's home. There is also some evidence that later in August movant declined to allow defendant to see them on the Saturday when she telephoned but told her that she could see them the next day, Sunday. There was no further elaboration of these events.

Movant is a meat-cutter and at the time of the hearing was employed at a salary of $141 per week. He goes to work at six in the morning and returns home at three. His wife states that the whole family spends its evenings, week-ends and days off together. Their home is a two-story brick house of eight rooms situated on two acres, on which movant has a purchase agreement. It is located on a blacktop road upon which the school bus operates regularly. Each child has its own separate room. The present Mrs. Fortune stated that the children were twenty-nine months and sixteen months of age when they came into her care; she described her feeling toward them in these words: "Tammy is like my own baby because I took care of her since she was a baby. I broke her from the bottle and had taken care of her. She feels like my baby. I love her." Q: "How about Teddy?" A: "I love him too, very much."

Mr. Sinco worked at service stations prior to and after his removal to Kansas City and, on the side, delivered ice machines and venders, a business in which his father was engaged as Kold Draft, Incorporated. At the time of the hearing Ralph Sinco was working for Kold Draft. The house in which he and defendant lived after marriage was described by his mother as a frame house, "in good condition as old houses go" with "four rooms down and a bath, basement, and they got two rooms up"; defendant stated that it had three bedrooms and was completely and newly furnished. Rental was $105 per month.

One of defendant's witnesses testified to the good care which defendant gave the children prior to turning them over to their father in 1962. Defendant's mother emphasized the patience, energy and good care of defendant in attending to the needs of the children in the same period. The mother of Ralph Sinco testified to her observations of the children during the period when they were with defendant in Kansas City; they were kept clean and had good food—"I would say she is a good mother."

At some unspecified time defendant had caused a garnishment to be run against movant effectively tying up his wages. In her affidavit for execution defendant swore to unsatisfied obligations in the amount of two thousand dollars, although at the hearing she placed his delinquencies at a maximum of six weeks payments or approximately $180. As a result of the garnishment movant was forced to give up his job and procure employment elsewhere.

Ralph Sinco's first wife testified as to Sinco's frequent use of profane and obscene language in the presence of their children, including the use of four-letter words which she would not repeat. Sinco did not testify. There was no evidence as to his earning capacity or as to his financial condition.

■ It is not necessary to pile citation upon citation to show that, in cases involving the initial award of custody or motions for change of custody, "the overall welfare of the children is paramount"

(Kimble v. Kimble, Mo.App., 399 S.W.2d 630, 634), that "The only rigid, inflexible and unyielding principle * * * is that the welfare of the child is paramount and supreme" (W—— v. S——, Mo.App., 414 S.W.2d 352, 360).

■ Where a court has before it appropriate for consideration a request for a change of custody, modification of an existing custody order will be granted only upon proof of changed conditions affecting the welfare of the children to a substantial degree; the burden is necessarily upon the moving party to show the existence of those changed conditions which justify and require the displacement of one custodial party and the substitution of another. M—— v. M——, Mo.App., 313 S.W.2d 209, 212.

A mere recitation of the undisputed testimony shows clearly that change of conditions which must exist in order to justify a change of custody. Birrittieri v. Swanston, Mo.App., 311 S.W.2d 364. While there is no direct evidence of defendant's circumstances at the time of divorce, it is plain that her situation worsened in the seven and one half months following the decree. She and the children lived in her parents' home, but for a considerable portion of that period the parents were away traveling and defendant was not working. In a short time defendant was in a straitened financial condition, indebted for groceries, utility bills and medical services, a condition contributed to in part by movant's inability to make support payments for a brief period while in the hospital. Defendant moved from the parents' home, procured employment for a short time and placed the children in the custody of a baby sitter. There was a progressive deterioration both in defendant's financial position and in her ability to devote to the children the time and attention which their tender years required. In this dilemma, knowing that movant was about to remarry, she voluntarily turned care and control over to him. For the next eighteen months,

defendant lived at ten different places in the St. Louis area, Chicago and Kansas City and was employed for varying periods at seven different business establishments. In that period defendant only once raised any question about resumption of her custodial rights under the decree and then, upon further consideration, dropped the matter and acquiesced in movant's continued custody.

Thus, we see that for the period up to the end of April 1964, custody de facto with the attendant cares and responsibilities was in the movant, although, formally, right of custody rested in defendant. In that period the mother moved from place to place and shifted from one employment to another—from all which a finding of instability might well be made. Admittedly the children have a good home with movant; they receive the regular attention of their father in the evenings, on weekends and on his days off. The record is devoid of any instance of mistreatment or lack of care. They are associated with their much younger half-sister, play with her and "take[s] care of her so much." The entire group appears to be a well-knit family unit. The present Mrs. Fortune has given a mother's devotion to the children since they were twenty-nine months and sixteen months of age respectively.

■ We are urgently reminded that it is a widely accepted "principle" that, all other matters being equal, the custody and control of children of tender years should be entrusted to the mother. We are furnished ample evidence of the continued reiteration of that proposition. But that frequency of repetition has not whetted its cutting edge as a tool for analysis, and that, for the reason that not all other factors are equally weighted in importance, Garbee v. Tyree, Mo.App., 400 S.W.2d 193, 199, except in the highly unusual case. Where, in the infrequently encountered situation, the other factors are found to be in such a finely balanced state, then the stated proposition may well be utilized as a make-

weight in order to arrive at a decision. But the qualification of equality as to other matters reduces the utility of the "principle" to the minimum. If the qualification be not satisfied, the "principle" is irrelevant. A reverential obeisance to motherhood cannot compete with the cardinal principle that the welfare of the child is the supreme consideration.

Defendant urges also that since she has now established herself in society, has the security of a husband and has procured a home and facilities for care of the children, her right to custody should be reaffirmed. At the time of the hearing, she had been married to the second husband for slightly more than two months. They had then occupied their home for approximately the same length of time. Her contention that her condition of life had been improved and stabilized rests upon an experience of two months, which we can hardly regard as of sufficient length to establish conclusively a metamorphosis of living pattern upon which to found the custody of children. We have admonished that "The court should not indulge in experiments with so important a trust, especially where the child is in a home where it receives good treatment and moral training." Birrittieri v. Swanston, supra. We believe that this counsel is as well applicable to an entreaty for the reaffirmation of a custodial decree as to a request for a change of custody. If this court were to deny movant's motion here on the ground that defendant's condition in life had improved we would, to say the least, be ordering the making of an experiment as to defendant's future living pattern, the success of her second marriage, the suitability of the stepfather as guide and exemplar. Continuance of the father's custody involves no such experimentation. The quality of his custody has been time—and experience—tested.

It is self-evident that, if the custody had been awarded initially to the movant, there is nothing in the record which would justify taking that custody away from him. During the time that the children have lived in his home the conditions of their existence have been made stable; the routines of their daily lives have been established. The care and training which they have received have been superior to that accorded to them otherwise. But the father has had only custody de facto, although a custody voluntarily conferred on him. If his motion had not been sustained, that custody de facto would have been extinguished. While the criteria governing the maintenance of a custody once ordered are not the same as those which require an official change of custody we think that in this case the evidence which would without question have precluded the taking of custody from the father in the hypothetical case is more than ample to sanction here the vesting of custody in him. Bearing in mind that judicial endeavor must be directed toward achievement of the ultimate good of the children, the evidence requires the conclusion that that goal can be better approached by converting the commendable custody de facto into a decreed custody.

At the time of the trial court's order modifying the custodial arrangement, the son Teddy was four years and eight months old and the daughter Tammy was three years and seven months of age. At the time of writing Teddy has reached seven years and Tammy is five years eleven months old. While the court's order from which defendant has appealed must be considered as of the time it was issued, we cannot close our eyes to the fact that time has marched on. Of Teddy's seven years, four and one half have been under the care of his father and the present Mrs. Fortune, except for the period of the Kansas City interlude. With the same exception four and one half of Tammy's five and 11/12 years have been under the same care. However, we have viewed the situation of the parties and the children as of the time when the trial court's order of modification was entered and agree with the disposition of the controversy made by the trial

court at that time. While we have, of course, no knowledge of the conditions which have prevailed since the entry of that order, we note that it is the privilege of the mother to open anew the question of custody, if so advised, on the ground that in the interim there has been such a change of conditions affecting the welfare of the children that she should be reinvested with their custody.

■ Twenty-one days after defendant mother had filed her appeal in the matter of modification of the custody order, No. 32,228, she filed a motion for an order requiring the father of the children to pay attorney fees and expenses of the appeal. The latter motion was sustained and judgment for a total of $555 in respect thereof was entered against the father. After an unavailing motion by the latter for a new trial, he gave notice of appeal from that judgment (No. 32,334). The brief of each party bears the numbers 32,228 and 32,334. However in respect to the judgment for suit money the father stands in the position of an appellant and hence he rests under the necessity of complying with Supreme Court rules relating to the preparation and content of briefs. Here the father's brief, although carrying the number 32,334, makes no reference of any kind to the judgment for suit money. Hence we have before us no appellant's brief dealing with the subject of his appeal. The father's appeal in No. 32,334 is dismissed for failure to comply with rules 83.05 and 83.06.

The judgment in No. 32,228 is affirmed.

PER CURIAM.

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, the judgment in No. 32,228 is affirmed.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.