ARTHUR C. MOTHERSHEAD, APPELLANT, v. MAUDELLE MOTHERSHEAD, RESPONDENT.—161 S. W. (2d) 669.

Kansas City Court of Appeals. April 6, 1942.

Rehearing Denied May 4, 1942.

*James H. Hull* and *Walter J. Gresham* for appellant.

738

S. K. Owen and Clay C. Rogers for respondent.

BOYER, C.—This is an appeal from an order of the Circuit Court modifying a previous judgment respecting· the custody of the minor child of the parties. The respondent was granted a divorce upon her cross-bill October 31, 1939, and at that time custody of the child was awarded to its paternal grandparents. The modifying order transferred custody to the mother July 22, 1941. After his motion for a new trial was overruled the father; deeming himself aggrieved by the judgment and decision of the court, duly appealed.

Reversal is sought on two grounds. First, that the court lacked power to modify the decree because no change of condition was pleaded or proved; and second, that defendant forfeited her right to custody in attempting to influence adversely the boy's respect for his father.

The motion to set aside the order respecting custody and to modify the decree alleged the granting of the divorce and entry of the following order:

."That Billy, the minor child of plaintiff and defendant be, and he hereby is, placed in the custody of· the parents of plaintiff, Mr. and Mrs. A. D. Mothershead; that defendant have the right and privilege of visiting said child at all reasonable and convenient times, and that defendant shall have the right and privilege of having said child visit

her in her own home each year between the 15th of June and the 15th of August."

The motion further states that the minor son is thirteen years of age; that since the decree he has not only been in the custody of Mr. and Mrs. A. D. Mothershead, the paternal grandparents, but in truth and in fact has likewise been in the custody of the plaintiff, an improper and unfit person to have the custody of said child; that plaintiff and his parents have alienated from her the affection of her son; that by their wrongful influence her said son has refused to visit her; that his custodians will not permit him to exhibit his natural love and affection for her or to associate with her; that it was beyond the power and jurisdiction of the court to award custody as was done in the first instance because the court determined that the defendant was the innocent and injured party, and did not find defendant to be incompetent or incapable of having the custody and care of her child; that this is contrary to the public policy of the State and unlawful; that defendant is financially capable of supporting and maintaining her minor son, and that her financial status respecting her ability to maintain, support and care for her minor son has changed since the decree of divorce; that the grandparents and the plaintiff are not fit and proper persons to have the care and custody of her son because the said Arthur C. Mothershead is permitted to live in the same house with her son and is addicted to drunkenness, and the grandparents have wrongfully influenced the said child against the defendant as aforesaid.

Plaintiff filed answer to this motion and denied all allegations thereof except that the minor son is thirteen years of age; that he is and has been in the custody of his paternal grandparents pursuant to the decree of the court; that the decree of divorce was rendered November 10, 1939, instead of October 31, 1939, and denies that there has been any change of condition since the rendition of said decree; that all of the matters set up in defendant's motion were presented to the court and taken into consideration in formulating its decree; that upon the testimony in said trial it was established that defendant was not a proper person to have permanent custody of the child; that in determining where custody should be placed the court called said child to the stand and examined him and awarded custody in accordance with his definite request, and that there has been no change in the preference then expressed.

Defendant testified that she is forty years of age; that she lives near Halls, Missouri, with her brother who is Treasurer of Buchanan County; that she has been a teacher in a public school nearby for three years and had a contract for another year; that she had a life diploma to so teach; that she had taught eight years altogether; that she had received additional training at the Maryville Normal and kept abreast with her vocation; that her present salary is $90 a month

during the school year and was increased $10 a month; that if the custody of her child be awarded to her she planned to live in St. Joseph with him, and after he finished his primary school work to give him the advantage of high school and junior college training, and further educational advantages to fit him for life's work; that the school where she was teaching and would teach is two and one-half miles from the city with means of conveyance; that she would take the boy with her to a fine rural school with four teachers, on the way to her school, until he finished his primary training; that she would be with the boy at all times, except during school hours; that she was a teacher of piano; that her son is musically inclined and she desired to teach him music; that she had an arrangement with her brother that during the vacation period she and her son would live with him and his wife on the farm about seven miles from St. Joseph; that they had no children and were anxious to have her and the boy live with them; that her brother would pay her for her work during the summer period; that he owned a 78 acre farm with a very comfortable and modern house; that her son would have a separate room in the house with modern conveniences and would have the opportunity of helping with the chores and be kept busy under wholesome rural conditions which she regarded advantageous. She further testified that she and plaintiff were married in 1926; that two children were born, the boy whose custody is now in question, and a younger son; that in 1932, plaintiff took her and the two children to live with his parents, and that they resided there until 1937; that he helped around the farm and worked on W. P. A.; that during the last year the younger son died and within about one month thereafter, on account of the misconduct and drunkenness of plaintiff, she left the home with her son Billy and went to live near her brother; that in July, 1938, plaintiff took the son away and kept him at his father's home where he has been ever since; that she was awarded a decree of divorce on her cross-bill to her husband's petition in October, 1939; that after the decree of divorce she saw her son at his school at Christmas time; that in the spring when she was supposed to have him for awhile, she went to the home where he was living with his grandparents near the little town of Barry in Platte County, which is approximately 35 miles from where she was living; that Arthur Mothershead lives there also. Anticipating some trouble, and to avoid it, she took the sheriff with her. She said: "He interceded for me, but the grandparents said unless the boy wanted to go he didn't have to go, so the boy said he would rather not go, and he didn't go." That was in 1940; she went to see him again in August of that year to pay a visit with a gift, but she did not see him; she saw his grandmother and asked where Billy was; she said he was about the place somewhere, but didn't do anything towards finding him; she looked about herself, but could not find him; she went again the next spring

when she was supposed to have him, at which time he was very nice and came to the door; she asked him to go to a birthday party for his great-grandmother, and he said he would have to ask his grandmother; that she told him to go ask her; he went to tell her about it and then said he couldn't go; he was later invited to go on a picnic at Excelsior Springs and she asked him to write; he sent a card and said he could not attend. Prior to the divorce and while she had the custody of her son, he expressed his love and affection for her and was obedient and respectful. "Three times he promised to go home with me when I would talk with him and he wasn't permitted to go, and he told me he wanted to go, but since the divorce I can't seem to get that response;" he has not expressed the same affection for her; her intention is to continue teaching and remain a resident of Buchanan County, and faithfully abide the orders and decrees of the court; that she very much desires to have her son with her and to have his love and affection back again as she had it once before.

On cross examination, she was interrogated with a view of showing that she was a follower of Rosicrucianism. She said: "I merely read along those lines because I was curious to know;" that she had told her husband that it might help him; that it probably did help her at that time. Reference was made to a letter which she had written her husband, part of which is the following:

"Wish you would think seriously of these thots & know as *I know* that a cure for your afflictions, mine, & that of all men be in a strong desire and will to 'Seek God' & we'll 'find Him' and our problems and fears 'vanish as mist before the rising sun.' I can help U now but could not before. My help will come by revealing to you the beauty and strength as revealed in the Rosicrucian Philosophy. It is more beautiful than Masonary—its secret laws can be revealed only to the pure in heart. I gave the address of one in California. My study is from Quakertown, Pa., with a little different philosophy. If you desire more information concerning this one write me. It has done wonders for me! I can verify all its statements thus far."

She stated that she believed some parts of what was said and thought it would help out at that time. She was asked if she still believed the basic philosophy of the Rosicrucians and answered: "Yes, sir, and the reason I did was because he tried everything else. I helped him. He didn't really try. It was my longing to help him that caused me to seek in part for this help." She was asked if she had not testified before the judge in the trial of the case that her dead son had spoken to her. The answer was: "I said there was a voice that said what I heard because no one else was in the room. It seemed to me it came from somewhere near there." "Q. You told your husband your dead boy had spoken to you? A. I presume I did. Q. You testified to that before Judge Lyons? A. Yes, sir." She said that she did not believe that one could communicate with de-

parted spirits; she had some correspondence and took a few lessons and said she knew the philosophy of her husband and knew he disapproved of our orthodox churches; that at one time she attended a meeting of the Academy of Divine Love in Kansas City as a visitor, and where her sister was employed; that she does not believe in the reincarnation that Rosicrucianism teaches. She claimed at the trial that her husband was addicted to drunkenness and not a fit person to associate with the boy, and that his drunkenness had caused him to lose jobs. "Q. Mrs. Mothershead. you say that the boy hasn't expressed any love for you since the grandparents have had him? A. He hasn't had much chance but he has expressed love. He said at the trial, 'I love her,' and he has offered to go home with me three times before the divorce and hasn't had a chance since then."

Plaintiff offered in evidence a number of letters written by defendant to her son with a view of showing that she improperly referred to deaths and gruesome details that would shock the boy and interfere with his feelings toward her and cause him to lose respect for his father. One of them was written before the divorce and the others afterwards. The first one written January 15, 1939, before the divorce, is an extended letter upon many subjects. Reference is made to the death of the mother of Mrs. Jenkins, defendant's sister-in-law, and the circumstances under which it occurred; that the deceased had said that she loved him. and wished she could see him, and had a Christmas present for him; she expressed her disappointment at not seeing her son at Christmas, and referred to his father going away and leaving her nights. "After jeering me in his letter Arthur talked mostly about *his rights*. I meant no offense by anything I said." She commends her son for being a brave little soldier, and after referring again to the boy's father going away and leaving her with two babes in arms and his opposition to her said: "Tell him to recall his experiences with women in the past. Also I request that he be informed correctly that he blame not my people but himself for any attitude which he has caused me to take during our years together and since. I have never confided in them concerning his unfaithfulness to me (nor have I to this day opened my lips) except as actions reveal in what they may have seen in him and in my own reaction to recent events. I have been ashamed for them or anyone to know and shall await its disclosure by his own act of calling a trial (when friends who know shall rally to the defense of one who has sacrificed much!!!)." Other letters addressed to the boy in endearing terms and about many subjects also refer to deaths of different people. In one of the letters dated April 16, 1941, she wrote: "I am counting on having you for my vacation this summer—and am not taking 'no' for an answer from your would-be benefactors. So prepare yourself thus."

On redirect examination, defendant said that she did not believe and follow the doctrine of the Rosicrucians; that she is devoted to the orthodox, the old-fashioned religion, is not a fanatic, and has no hallucinations about anything; that she was reared in a Christian family, attended a Christian college, and that was her preference; that the drunken and disorderly conduct of her husband caused her great worry of mind, and the loss of her youngest son, great grief and distress; that she was ashamed and humiliated by her husband's conduct; that she sought mental relief and took advantage of literature that came to her; that since she has been free she has been more quiet and settled in mind; she has not followed any isms, cults or creeds since that time; that after the death of her youngest child she was alone with him, greatly distressed in mind, and at the time there appeared to her some comforting voice, and that is what she meant when she said she heard a voice; that she has no intention of making a study of any isms or cults or teaching it to her son or to associate with people of that faith.

Mr. and Mrs. Claude Jenkins, the brother and sister-in-law of defendant, testified to their desire to have the defendant and her boy live with them under the arrangement outlined by the defendant; that they were greatly attached to the boy who had lived near them while he was with his mother before the divorce. They described the accommodations they could afford and the assistance they would gladly render. Their testimony is to the effect that when the defendant left her husband and came to live on the farm in another house very near to them, with the boy and with the family of her mother and father, she was a nervous wreck and in great distress over the death of her child and greatly grieved over what had occurred and her situation; that since the divorce she has recovered her poise; that there is nothing the matter with her mind, and she is now normal in all respects; that her condition improved 100%; that she attends church regularly and is not a fanatic.

Three ladies of long acquaintance with the defendant, and the minister of the church which she attends all testified in highest terms of her intellectual qualities, exemplary conduct and splendid character. Some of these witnesses also described the Jenkins home as modern, one of the finest in the community and to the fine Christian character of the owners. Three witnesses testified that sometime in February, 1941, plaintiff was seen in St. Joseph in a drunken condition.

Plaintiff testified that it is not his custom to get drunk; that during the past two years he had not been what he would call drunk, and there had never been a time when he did not know what he was doing or could not carry what he swallowed; that he takes a drink when he feels like it; that he was in St. Joseph in February. "Q. Was there any time you were in St. Joe you didn't know what you were doing? A. I don't think so. Q. How did you go up there? A.

In my car. Q. Was there any time you weren't able to get home from there? A. Never was." He testified that after Billy had been with his mother at Halls and came back to him July 4, 1938, his condition was pitiful, "like an old man with palsy;" he was poor and skinny; he is inclined to be that way; that since said time he has improved; that he and the boy live at his father's house; that he has been employed since July 9th at $25 a week; previous to that he had worked at different places, and said: "I have stepped from one work to another." He said that after the boy finishes grade school he is to go to high school at Parkville, and can have his college education wherever he wants to go; that the boy's health is now excellent, and that he is happy; that he is in partnership with his grandmother and has a half interest in a flock of fine chickens; that he goes to church and Sunday school. Plaintiff stated that he had never said anything to the boy to discourage his love for his mother; that he had talked with him occasionally about going to visit his mother and he was not willing to go.

On cross examination he said that defendant was a good, moral woman "so far as I know" and he had nothing against her from a moral standpoint; that he contributed nothing to the support of his boy or to that of his parents; he claimed that the boy "is self-sustaining;" that he lives in the same home with him. He admitted that he had previously testified in his deposition taken one week before the trial that he had made no arrangements for the education of the boy; that he never wanted the boy to visit his mother; that he never heard him express any affection for her; that he has had the boy since July, 1938. On further cross examination he stated that he had not saved any money, had no bank account, and had made no financial arrangements for the boy and does not contribute to his support. Upon examination by the court he repeated that he did not want his son to visit his mother since the divorce and thought it was to the child's detriment to be with her "because she is a psychopathic case; her conversations are unwholesome and morbid and detrimental to the child;" that during the last three or four years of his married life she was "very decidedly a mental case."

Further testimony shows that at the time plaintiff took the boy in 1938, he had been ill and operated on for the removal of his tonsils. Plaintiff claimed he didn't need it; that at time the boy came down to visit him. "Q. And you kept him? A. You bet I did. Q. You haven't wanted him to be with his mother since? A. That is true. Q. You don't want him to now? A. That is true."

The testimony of Mr. and Mrs. Mothershead, the grandparents, is to the effect that they have a good home on 147 acres of land which they own; plaintiff is their only son; they are anxious to keep the boy; they think they can furnish him a better home than his mother can furnish; that the boy won't talk about his mother and has not

visited her since he has been with them; they thought he was afraid to go; that they never said anything to the boy to the effect that he should not love his mother; the grandfather is an elder in the church and goes there with Billy every Sunday; that the boy is now healthy and strong; that his physical condition was nothing like as good when he last came to them; that he attends grade school. The grandfather said that the boy should have a college education if he wanted it.

On cross examination the grandfather stated that the only home that his son provided for his wife from 1932 to 1937 was at his house; that Arthur is his only son and lives at his home. "Q. You want to retain custody of this boy, and bring him up in the same environment in which your son Arthur lives in, don't you? A. I don't see how I could do otherwise without running my son away, and I won't run my boy away. Q. . . . He will be under the influence of your son? A. That is the condition." He stated he had no objection to the mother of the boy on moral grounds and admitted her present associates are good, moral people; "I haven't a thing on earth against her."

The grandmother further testified that nothing had ever been said to the effect that the boy should not love his mother or should not visit her; that she had not discouraged defendant from coming there; that she had no affection whatever for the boy's mother at that time; that she never talked to the boy about his mother; that she had never heard him express any affection towards his mother; she had never told him that he ought to see his mother, but had told him he may see her if he wants to; she had never urged him to do that or to express any affection for her; that she did not want the mother to have custody of the child; he was happy and contented where he was; "we have a better home, he wants to stay with us."

The court made further inquiry as to why witness thought the boy would be better off in her home than reared by his mother. "The Witness: He has lived in our home for the last ten years. He feels like it is his home. He loves it. The Court: Do you think any boy is being properly reared, and in a way that is best for him, when he grows up and has no affection for his mother? Do you think that is best for a boy? You are a mother. The Witness: I can't answer that. I don't know. . . . The Court: Do you believe there are any things or there is anything that would take the place of the respect of a boy for his mother? The Witness: When he can't have the love of his mother and a home both, which is he going to do?"

Several witnesses testified to the high moral and social standing of the grandparents and the comfort and convenience of their home. Two of them testified that the boy was now in better physical condition than when he returned to the home of the grandparents in 1938; that the boy appeared to be happy and contented.

This statement is longer than necessary. In deference to counsel it is not limited to bare essentials but is designed to include the essence of all the proof that is emphasized in argument and for which grave consideration is invoked.

The modification of a divorce decree with reference to the custody of a child because of changed conditions is a matter within the sound discretion of the trial court. [Westerman v. Westerman (Mo. App.), 153 S. W. (2d) 825.] The contention of appellant is that the evidence does not disclose any change of conditions that would warrant a modification of the previous decree; that the grounds of complaint were presented to the court at the time of the divorce trial, and, in effect, seeks application of the doctrine of *res judicata*. Upon the whole evidence such contention is not tenable. There was substantial proof of various matters that would justify a finding by the trial court of a material change in conditions as they existed at the time of the original decree affecting the welfare of the child and the rights of his mother. In the first place, it could reasonably have been found that the custodians of the child had violated the terms of the order upon which custody was awarded; that they were hostile to defendant in the exercise of her right to visit the child and have him visit her according to her privileges granted in the order; that they have no affection for her or proper regard for her rights; that they have aided and abetted in an estrangement between mother and child; that they have improperly permitted the child, for all intents and purposes, to be under the influence and control of plaintiff, who lives in the same home; that he is an incompetent person and has no right to exercise such privilege in a manner adverse to the interest and rights of defendant; that defendant has been deprived of the association with her son to which she was entitled, all of which had an adverse effect upon the natural love and affection of the child for his mother. Further, the court was justified in finding, if not required to do so, a marked difference and improvement in the physical and mental condition of defendant and her financial circumstances since the decree of divorce, and that she is in all respects a fit and competent person to exercise the legal right of the custody of her own child.

While plaintiff appeared in this case as the opposing party, he made no claim for custody in his own behalf. As the matter was presented to the court it was a contest between a parent and the grandparents over the legal right to custody of the parent's child, and the effect that a change of custody might have upon the welfare of the child.

As between the parents of a child the right to custody and control is equal, and in a contest between them over such custody the statute. Section 1528, Revised Statutes Missouri, 1939, provides that the court shall decide only as the best interests of the child itself may seem to require. When one parent has abandoned right of custody or does not claim such right, as in this case, the right of the other

parent to custody is paramount to that of all others, unless it is made manifest to the court that the parent claiming custody, ''for some reason, is unfit or incompetent to take charge of the child; or unless the welfare of the child itself, *for some special or extraordinary reason,* demands a different disposition of it at the hands of the court.'' [State ex rel. v. Ellison, 271 Mo. 416, 427, and cases cited.] There is no evidence in this case that at the time of the hearing the defendant, mother of the boy, was unfit or incompetent in any respect to take charge of him, or unable to maintain and support him in a comfortable home. In fact, all the evidence is the other way. There is no proof that the welfare of the child for any *special or extraordinary reason* demands that the mother be deprived of his custody. The claim of the grandparents is that they are better able financially to provide for the boy and can furnish him a better home than his mother could provide. Such a claim, if true, should not be accorded dominant influence. The mother appears to be well established in her vocation, and since the decree has received an increase in salary. Prospects of providing a suitable home and affording educational and cultural advantages, as outlined by her, appear to be favorable. However, if financial need should arise, attention is called to the primary duty of the father to support his son. The mother of the boy could enforce this legal obligation, or at least obtain judgment for the cost of his maintenance if she elects to do so. [Mayes v. Mayes, 342 Mo. 401, 407, 116 S. W. (2d) 1; Kelly v. Kelly, 329 Mo. 992, 47 S. W. (2d) 762.]

The interest of defendant in Rosicrucianism at a time when she was attempting to reform her husband, and when in the midst of almost hopeless distress occasioned by his dereliction and the visitation of death, should not, in view of the evidence of her present normal health and wholesome mental attitude, militate against her rights. Nor is the evidence sufficient to require a finding that she has forfeited her privilege of custody by the letters written to her son. The circumstances and provocation under which the letters were written and the maternal feeling of the author should be remembered. Like unknown depths of the sea the depth of the love of a good mother for her offspring has not been measured, and when she has reason to believe that the natural affection of her child is being blighted by improper influences her reactions may be forgiven even though they might appear to be immoderate and ill-advised when not provoked. There is no indication that the court failed to give due consideration to all the evidence.

The trial judge had the opportunity to observe the demeanor of all the witnesses and weigh their words as spoken. Upon the whole record in this case it is not possible to find that he failed to exercise a sound discretion and abused discretion in changing the custody of the child to that of the mother. ''The finding of the trial judge on

748

motion to modify should not be lightly disturbed, and should, in fact, be deferred to, unless it is apparently in conflict with a clear preponderance of the evidence and discloses a manifest abuse of judicial discretion." [Salkey v. Salkey, 80 S. W. (2d) 735, 740; Saunders v. Saunders, 223 Mo. App. 834, 14 S. W. (2d) 458, 461; Barnhart v. Barnhart, 253 S. W. 56.]

The conclusion is that the order of the trial court modifying the decree respecting custody of defendant's minor son should be affirmed. The Commissioner so recommends. *Sperry, C.*, concurs.

PER CURIAM:—The foregoing opinion of Boyer, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.