Karon M. WAITES, Appellant,

v.

Charles R. WAITES, Jr., Respondent.

No. 60030.

Supreme Court of Missouri,
En Banc.

May 24, 1978.

Ronald E. Taylor, St. Joseph, for appellant.

Jimmie D. James, Independence, for respondent.

SEILER, Judge.

This appeal is from a judgment of the circuit court of Jackson County in a dissolution of marriage case in which the trial court awarded custody of two minor children to respondent, father, basing its judgment on its disagreement with the religious beliefs of the appellant, mother. The appellant alleges that the judgment of the trial court violates various rights under the First and Fourteenth Amendments to the United States Constitution and Art. I, §§ 5 and 7 of the Missouri Constitution. Insofar as the issues raised are alleged by appellant to involve the construction of these portions of the United States and Missouri Constitutions, we have exclusive appellate jurisdiction under Missouri Constitution, Art. V, § 3.

## I.

Charles R. Waites, Jr., and Karon M. Waites were married in Raytown, Missouri on October 16, 1971. Except for a brief period of separation in 1975, the parties lived together until February 7, 1976, at which time they again separated. Two daughters were born of this marriage, namely: Shelley R. Waites, born July 20, 1974, and Monica L. Waites, born June 9, 1976. Mrs. Waites filed a petition for dissolution of the marriage and custody of the children on July 12, 1976. Respondent filed an answer and cross-petition for dissolution wherein he sought custody of the children. The dissolution hearing was held on November 30, 1976.

There being no dispute concerning the dissolution of marriage, the evidence offered at the dissolution hearing was directed primarily to the issue of custody of the two minor children.

The facts, taken largely from appellant's statement (which respondent's brief adopts as being adequate, accurate and not argumentative), are as follows:

Appellant testified that she was employed and that her mother had been caring for the children while the appellant was at work. Appellant testified further that she regularly played with her daughters, read to them, disciplined them, washed their clothes, cared for and loved them, and as their mother, wanted the little girls to remain with her. Appellant testified that at one time she had been a Baptist, but that she since changed her religious faith to that of Jehovah's Witnesses, and that this change in her religious beliefs had caused many arguments between her and the respondent and had resulted in several incidents where she had been slapped and threatened verbally. There was further testimony that respondent had threatened to break the arm and nose of the appellant and on one occasion during pregnancy had threatened her with a gun and told the appellant that she should be destroyed, this last incident having been witnessed by the older daughter of the parties. Appellant acknowledged that on one occasion during an argument that she had slapped respondent.

There was further testimony that respondent had threatened other members of appellant's religious faith with his rifle and that he had on several occasions and over appellant's objections, offered and given alcoholic beverages to the older daughter. Nevertheless, appellant testified that if she retained custody of the little girls, she would encourage them to love and respect their father and would do nothing to poison their minds against him.

Upon cross-examination appellant acknowledged that respondent had been a good provider, a good father, and a responsible person. There was extensive cross-examination of appellant concerning her religious beliefs, including her beliefs on Armageddon, non-believers, false religions, world governments, and Satan's role therein, flag salutes, pagan practices, celebration of holidays and birthdays, Earth's restoration to paradise, blood transfusions, military organizations, police organizations, of which Mr. Waites is a member, bad associations, pre-marital intercourse, religious images, voting, door-to-door preaching, baptism, medical care and treatment, and disfellowshipping. Appellant agreed that she would attempt to teach her daughters from the Bible, and raise them as Jehovah's Witnesses.

The respondent testified that he agreed with the appellant that the primary cause of the marriage breakdown was the appellant's change of religion. Respondent testified that appellant had been a good, clean wife who loved her children but she has not been as good a wife after her change in religion and even his sex life had been affected. Respondent testified further that he was a patriotic ex-marine and that he had many disagreements with the religious beliefs of the appellant, including her beliefs on the celebration of holidays, flag salutes, and the pledge of allegiance. Respondent also offered testimony concerning the incident where he had told the appellant that she needed to be destroyed or confined and how he had threatened her with his gun to test her reaction. Respon-

dent testified additionally about disagreements between appellant and respondent concerning the children, and stated to the court that, in his opinion, if the daughters were raised by the appellant that he would not have a normal relationship with his daughters and that the daughters would not have a normal childhood. Consequently, if awarded custody respondent proposed to remove the children to Schell City, Missouri, where his parents could assist with the children and he would commute to Blue Springs to his employment.

Upon cross-examination, respondent acknowledged that he was a police officer in Blue Springs, Missouri, and that he was on probation as a result of having threatened appellant with his gun. He also acknowledged that he had formerly been a police officer in Grandview, but that he had been asked to leave that department because of being involved in an incident where beer was bought for minors. Respondent acknowledged that he had had four jobs during the last five years, and admitted having pushed appellant and having raised his voice to appellant in presence of their older daughter. Respondent also testified that if he had the children, that he would tell them that the appellant's religion was a false and corrupt religion.

The appellant offered rebuttal evidence from her mother, Mrs. Wanda Wendel, who baby-sat for the children each workday. Mrs. Wendel's testimony was to the effect that appellant fed the children, kept them clean, read to them, played with them, and did not ignore the children because of her religion. Mrs. Wendel expressed her love for the grandchildren and her continuing willingness to care for the children while appellant was employed. Mrs. Wendel is age 49. Respondent's mother was also present in the courtroom but was not called to testify.

On February 7, 1977, the trial court entered its findings of fact and conclusions of law, the relevant portions of which we copy verbatim as follows:

*Findings of Fact*

5. [B]oth children have been in the care, custody and control of the petitioner since the time of the separation.

8. That petitioner is gainfully employed with a net take home pay of $537 per month.

9. That respondent is gainfully employed as a police officer with a net take home pay of $682 per month.

10. That prior to, at the time of and during the early years of the marriage, the parties were members of the Baptist denomination of the Christian religion.

11. That in July 1975 petitioner converted from the Baptist denomination of the Christian religion to the Jehovah's Witness denomination of the Christian religion and was baptized into the Jehovah's Witnesses in October 1975.

12. That the primary difficulty preventing a reconciliation or preservation of the parties' marriage has been the petitioner's belief in and practice of certain doctrines of the Jehovah's Witnesses denomination of the Christian religion.

13. That petitioner acknowledged her total belief in the entirety of the Bible.

14. That the petitioner acknowledged and recognized as authoritative the doctrines and principles set forth in respondent's exhibits Nos. 1, 2, 3 and 4. [No. 1— *Listening to the Great Teacher* ; No. 2— *The Truth That Leads to Eternal Life* ; No. 3—*Paradise Restored to Mankind by Theocracy* ; No. 4—*The Watchtower—1973.*]

15. That the primary beliefs and the doctrines professed by the petitioner which created problems between respondent and petitioner are as follows:

(a) Petitioner does not believe in blood transfusion, even if necessary to save the life of one of her daughters;

(b) Petitioner does not believe in saluting the flag;

(c) Petitioner does not believe in celebrating birthdays;

(d) Petitioner does not believe in celebrating the Nation's birthday or any national holidays;

(e) Petitioner does not believe in celebrating relative's birthdays;

(f) Petitioner does not believe in celebrating Christmas;

(g) Petitioner believes that all governments are under the control of Satan;

(h) Petitioner believes that all other forms of religion other than Jehovah's Witnesses are false religions;

(i) Petitioner believes that all governments and all other false religions stand in the way of world peace;

(j) Petitioner believes that all military bodies are instruments of the devil;.

(k) Petitioner would not use life threatening physical force even to save the life of her child;

(*l*) Petitioner literally believes in the doctrine of Armageddon and believes that only members of the Jehovah's Witnesses will be spared from the holocaust and believes this holocaust shall occur during her lifetime.[1]

. 16. Respondent is a former member of the United States Marine Corps and presently is employed as a police officer for the City of Blue Springs.

17. Respondent strongly feels contrary to those beliefs of petitioner set forth in Paragraph No. 15 above.

18. That the present beliefs of petitioner are contrary to the beliefs mutually enjoyed by both of the parties prior to her conversion to the Jehovah's Witnesses denomination of the Christian religion.

19. That according to the principles professed by petitioner, respondent is an "unbeliever."

20. That petitioner acknowledged as authoritative and true and professed and stipulated a belief in the doctrines set forth in respondent's Exhibit No. 2, "The Truth That Leads to Eternal Life." At page 131 of said Exhibit it is stated as follows:

"If you love truth and righteousness, then you will also hate and avoid what is false and displeasing to God."

"(Pg. 132) Because there can be no proper fellowship between those practicing righteousness and those practicing lawlessness, God commands: 'Therefore get out from among them, and separate yourselves.' "

21. That petitioner has acknowledged and would raise her two infant daughters of tender years in the doctrines and beliefs of the Jehovah's Witnesses and command their attendance at all meetings and functions until they were approximately sixteen years of age.

22. That by the defined doctrines of the Jehovah's Witnesses denomination of the Christian religion, the respondent would be considered an unbeliever, follower of a false religion and practicer of pagan rituals.

23. That upon the court's inquiry, petitioner acknowledged that she does not believe in participating in governmental functions of voting and that this is a belief of her religion.

24. Respondent, in his agitation concerning petitioner's practices as a Jehovah's Witness has scuffled with petitioner and at one time pointed a gun at her.

25. However, respondent loves his children, is industrious, and is capable of properly caring for the children.

26. That respondent's parents are capable and sincerely willing to assist him in the caring of the children.

*Conclusions of Law*

3. The primary factors set forth in Revised Statutes of Missouri 452.375 in determining the custody of children is the best interest of the child and include, among other things, the interaction and interrelationship of the child with his parents, his siblings, and any other person who may significantly affect the child's best interests and the child's adjustment to his home, school and community.

1. In addition to the foregoing, appellant was also questioned as to what she believed would happen to people not in God's favor, whether she believed in symbolism, and whether she would be willing to renounce her religion if necessary to retain custody of her children.

4. That the children of this marriage are of tender and impressionable years and it can be reasonably expected that, if raised under the indoctrinations which petitioner-wife professes they will be, it would not be in their best interest for the following reasons:

(a) That the children's health is severely threatened by reason of petitioner's refusal to agree to blood transfusions when needed;

(b) The children's affection for their father and, therefore, his rights of visitation and companionship and respect would necessarily be alienated because of the father's alleged pagan activities and belief in an allegedly false religion;

(c) The children's association with other members of their family, i. e., grandparents, etc., would be significally affected for the reasons set forth in Subparagraph (b) above;

(d) The children's adjustment to their home, school and community would be adversely affected in that they would not be allowed to participate and develop normally in the school and community relationship;

(e) That the children's growth and development as productive citizens within our society would be hampered.

5. Petitioner has love for the children and attempts to properly provide for them. However, her beliefs as a Jehovah's Witness comes first, and by her actions and beliefs she is jeopardizing the health, welfare and best interests of the children.

6. That respondent-husband is a fit and proper person for the care and custody of the two minor children.

7. That the best interest and welfare of the minor children of the parties would be best served by placing said children in the care, custody and control of respondent-husband.

8. That petitioner wife should not, at this time, be required to pay respondent-husband any sum of money towards the support of said minor children.

9. That petitioner-wife should be granted the right to visit with said minor children at all reasonable and proper times.

At a subsequent hearing on respondent's motion for transfer of custody to him pending appeal, which the trial court granted, appellant testified she spent a good deal of time with the girls teaching them such things as baking, housework and cleanliness and took them on picnics and to the zoo. Respondent testified the older girl had always been in appellant's custody and that the little girl was a good daughter, healthy, well-mannered, learning normal subjects such as reading and counting, was clean and well dressed and received regular medical care. He also testified that neither child is in need of any medical treatment which they have not received. Appellant explained that if the children were transferred to respondent and put with his parents at Schell City she would not be able to visit them there very often. She expressed concern over respondent's mother's ability to care for the children adequately because of a physical disability and also about the violent temper and drinking habits of the respondent's father and his display and handling of firearms of which he has a collection of twenty or more. Respondent testified his father drank, but not as much as appellant's father. Respondent's father considers appellant a traitor.

The trial court stated that its conclusions that the children should be with the father pending appeal were "based primarily upon the evidence heard at the original trial" and the findings and conclusions there made.

## II.

We deal in child custody cases with some of the most difficult and sensitive problems which face the judiciary. A marriage, which itself "is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred," *Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965), has ended and children, faultless in the parental dispute, are the objects of a sad residual conflict. Though we clothe the interests of parents in the raising and the education of

their children with the right of personal privacy, *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978); *Carey v. Population Services International,* 431 U.S. 678, 684, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), child custody suits defy the concept of a united parental objective and compel us to spare the sword of Solomon, 1 *Kings* 3:23–27, and determine as clearly as we can, what "the best interests of the child" require. Sec. 452.375, RSMo Supp.1975; see Brosky and Alford, Sharpening Solomon's Sword: Current Considerations in Child Custody Cases, 81 Dick.L.Rev. 683, 685 (1977).

Our statute concerning custody, § 452.375 RSMo Supp.1975 contemplates the consideration of many factors in resolving a child custody dispute, stating that

"The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) The wishes of the child's parents as to his custody;

(2) The wishes of the child as to his custodian;

(3) The interaction and interrelationship of the child with his parents, his siblings, and any other person who may significantly affect the child's best interests;

(4) The child's adjustment to his home, school and community; and

(5) The mental and physical health of all individuals involved."

We are squarely faced in the instant case with the question of what role, if any, can the factor of religion play in the judicial resolution of a child custody dispute consist-

ent with the framework of our federal and state constitutions.[2]

### III.

Article I, § 7 of the Missouri Constitution provides that "no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship." This provision, together with the other relevant state constitutional prohibitions is more "restrictive" than the First Amendment to the United States Constitution in prohibiting expenditures of public funds and other public or governmental actions "tending to erode an absolute separation of church and state." *Americans United v. Rogers,* 538 S.W.2d 711, 720 (Mo. banc 1976); *id.* at 724 (Seiler, J., dissenting); *Paster v. Tussey,* 512 S.W.2d 97, 101–02 (Mo. banc 1974), *cert. denied,* 419 U.S. 1111, 95 S.Ct. 785, 42 L.Ed.2d 807 (1975), *quoting Harfst v. Hoegen,* 349 Mo. 808, 163 S.W.2d 609, 612–14 (banc 1942).

It would be inconsistent to deny that however removed our courts must be from the choice of religion in custody disputes, the final determination of a custodial parent as to the religious orientation of the children is "subject always to the paramount general consideration of the children's welfare." *Hirsch v. Hirsch,* 366 S.W.2d 484, 490 (Mo.App.1963). It is also unnecessary for courts to be against the establishment of religion *per se,* as this antagonism is not contemplated by our state constitution. *Cf. Dansker v. Dansker,* 279 S.W.2d 205, 210 (Mo.App.1955) (the virtues of religious training as a factor in custody disputes); *Johnson v. Fish,* 197 S.W.2d 990, 993 (Mo.App.1946) (praising custodian mother as a religious woman who would send the children to church); *Krueg-*

---

**2.** Appellant argues that the trial court decree was in contravention of her rights under the "free exercise" clause of the First Amendment and under Art. I, § 5 of the Missouri Constitution protecting the citizens' "natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; . . . " *See* Comment, Child Custody: *Best Interests of Children v. Constitutional Rights of Parents,* 81 Dick.L.Rev. 733, 737–39 (1977).

We do not believe that the rights of parents to worship as they please are at issue in a child custody dispute; what is rather jeopardized by the expression of a judge's religious preference is the right of each citizen that the state not make determinations of any kind which respects, prefers or favors one religious persuasion over another, flowing from the "establishment" clause of the First Amendment and Art. I, § 7 of the Missouri Constitution.

er v. Krueger, 107 S.W.2d 967, 972 (Mo.App. 1937) (the advantages of Sunday school).

Yet, however much in favor of religion we may be, in a custody dispute between parents of different and conflictual religious persuasions, "we can not, under the system of law which we are appointed to administer, look · at that [and choose one religion over the other]. The state of which we are citizens and officers, does not regard herself as having any competency in spiritual matters . . . The law does not profess to know what is a right belief." *In re Laura Doyle,* 16 Mo.App. 159, 166 (1884). Indeed, though courts may praise religious training in the defense of a challenged custodial parent as was done in *Dansker, Johnson* and *Krueger,* "we cannot say that failure to send a child to Sunday School is a ground for changing custody. According to our view, the child should have religious training. To say, however, that the parent of a child· must give such child religious training is to enter a field of controversy from which the courts should stand aloof." *Rone v. Rone,* 20 S.W.2d 545, 548 (Mo.App. 1929).

In *Mothershead v. Mothershead,* 236 Mo. App. 737, 161 S.W.2d 669 (1942), the court considered the implication of a custodian mother's earlier interest in Rosicrucianism, a religious sect which believes in reincarnation and communication with departed spirits, and concluded that such interest, subsequently disavowed, should not disqualify her as her child's custodian parent "in view of the evidence of her present normal health and wholesome mental attitude." 161 S.W.2d at 676. Apart from the difficulty in the application of such normative qualifiers as "normal health" and "wholesome mental attitude", we do not believe that the court in *Mothershead* went far enough in preventing the intended or indirect choice of a religion by a court in a child custody dispute where the parents are of differing and conflictual religious persuasions.

Cases from other jurisdictions concerning whether a parent's identity as a Jehovah's Witness would *ipso facto* disqualify them as custodians of their children use language and echo sentiments with which we are in agreement. In *Cory v. Cory,* 70 Cal.App.2d 563, 161 P.2d 385 (1945) the California District Court of Appeals said that "[d]iffer as we may, and, we might say, as most of us do, as to the wisdom and soundness of the reasoning of plaintiff and her fellow Witnesses, it is not for courts to say that her religious convictions and those of her associates are necessarily such as to jeopardize the interests of their children." 161 P.2d at 390. In *Jackson v. Jackson,* 181 Kan. 1, 309 P.2d 705 (1957), where the mother was a Jehovah's Witness, the Supreme Court of Kansas said that "the question of religion cannot be regarded as entering into this case." 309 P.2d at 712, *quoting Denton v. James,* 107 Kan. 729, 193 P. 307, 311 (1920). In *Salvaggio v. Barnett,* 248 S.W.2d 244 (Tex.Civ.App.), *cert. denied,* 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952), another Jehovah's Witness case, the court said that "[i]n choosing between parents who are contending for the custody of the child, a magistrate has only such powers as the law has conferred upon him to determine whose custody would best promote the interest and welfare of the child. Under the American principle of separation of Church and State, the secular power is so shackled and restrained by our fundamental law that it is beyond the power of a court, in awarding the custody of the child, to prefer, as tending to promote the interest of the child or surround it with a more normal atmosphere, the religious views or teachings of either parent." *Id.* at 247; *see Reynolds v. Rayborn,* 116 S.W.2d 836, 839 (Tex.Civ.App. 1938). In *Stone v. Stone,* 16 Wash.2d 315, 133 P.2d 526 (1943), the Supreme Court of Washington said that "[w]e do not doubt the right of the state to suppress religious practices dangerous to morals, and presumably those also which are inimical to public safety, health and good order, but so far as appears from the testimony in this case, the teachings of Jehovah's Witnesses cannot, in our opinion, be classed in any one of these categories." 133 P.2d at 529.

■ We reiterate our determination that the Missouri Constitution contemplates a strict and pervasive severance between religion and the state. Any suggestion that a state judicial officer were favoring or tending to favor one religious persuasion over another in a child custody dispute would be intolerable to our organic law. Judges should not even give the appearance of such preference or favor.

■ In the case before us it is apparent the court focused primarily on appellant's religious beliefs per se, rather than on what the best interests of these children required as to' custody. We hold that no judicial officer may determine child custody based on approval or disapproval of the beliefs, doctrine, or tenets of the religion of either parent or their interpretation thereof. We recognize it would be impossible and unrealistic to expect courts to ignore the existence of religion or to be blind to its place in our mores. But there is a vast difference between concentrating on the religious choice of a parent as compared to concentrating on what is best for the child. Inquiry into religious beliefs *per se* is impermissible; inquiry into matters of child development as impinged upon by religious convictions is permissible, as, for example, where a parent

might properly be asked whether he or she would refuse to permit the child to attend a school class where evolution is taught; or where religion is being used as a subterfuge, as, for example, an alleged religious tenet which advocates shoplifting as a means of helping the needy. Inquiry into the exposure of the child to the practice of shoplifting would be justified and proper. The difference here is not superficial but fundamental: the state shall prefer no faith but must favor the best interests of those children whose parental custody it determines.

IV.

Having now determined that the basis of the trial court's disposition of the instant case was in error, we must decide whether this cause is to be remanded for further proceedings not inconsistent herewith or whether the evidence in the record clearly compels the resolution of the dispute in favor of one or the other parent. *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976); *Baker v. Baker,* 475 S.W.2d 130 (Mo.App. 1971); § 512.160.3, RSMo 1969; rule 84.14.

The uncontroverted testimony in this case was to the effect that this appellant was a loving mother to these young girls,[3] who

---

**3.** Though these two girls are not quite age four and two, the applicability in this case of Missouri's presumption of tender years was not mentioned by the trial court, and while the parties refer to it in their briefs, it is not advanced as being decisive. That presumption of early vintage, is based upon the proposition that "it is well known by all men, [that] no other love is quite so tender, no other solicitude quite so deep, no other devotion quite so enduring as that of a .mother. Generally, the love, solicitude and devotion of a mother cannot be replaced' by another and is worth more to a child of tender years than all other things combined and it should not be deprived of the necessary and wholesome influences which spring from these characteristics of a mother if it can reasonably be avoided . . . There is but a twilight zone between mother's love and the atmosphere of heaven, and all things being equal, no child should be deprived of that maternal influence unless it be shown that there are special and extraordinary reasons for so doing." *Horst v. McLain,* 466 S.W.2d 187, 189 (Mo.App.1971) *quoting Ellis v. Johnson,* 218 Mo.App. 272, 260 S.W. 1010, 1012 (1924) and

*Tuter v. Tuter,* 120 S.W.2d 203, 205 (Mo.App. 1938). The three districts of the court of appeals are not in complete agreement as to the standard to be applied in overcoming the presumption, *compare, e. g., Horst v. McLain,* 466 S.W.2d 187, 190 (Mo.App.1971) *with Johnson v. Johnson,* 526 S.W.2d 33, 37 (Mo.App.1975) and *Garbee v. Tyree,* 400 S.W.2d 193, 199 (Mo. App.1966); *see* Annot., 70 A.L.R.3d 262, 285–86 (1976); 42 Mo.L.Rev. 136, 142–43 n. 39 (1977). The presumption has been stricken from other jurisdictions for reasons of public policy, *e. g., In re Marriage of Winter (Winter v. Winter),* 223 N.W.2d 165 (Iowa 1974), statutory preemption, *e. g., Knight v. Knight,* 196 Neb. 63, 241 N.W.2d 360 (1976), and unconstitutionality, *e. g., Watts v. Watts,* 77 Misc.2d 178, 350 N.Y.S.2d 285 (Fam.Ct.1973); *see* Roth, The Tender Years Presumption in Child Custody Cases, 15 J.Fam.L. 423 (1977). Though the continued usefulness of the presumption is not before us, we note the advanced literature which explores the varied and complex needs of children of tender years, *e. g.,* S. Fraiberg, Every Child's Birthright: In Defense of Mothering (1978); J. Goldstein, A. Freud, A. Solnit,

kept herself regularly employed in an effort adequately to support them. The testimony showed that she regularly spent her time with the children. She read to them, taught them, kept them with her while she did household chores, took the girls on outings to the zoo and on picnics, kept them clean, fed, and disciplined, as well as provided Bible training consistent with her religious faith.

The trial court's Conclusion of Law Number 4(a) states that the children's health is severely threatened by appellant's refusal to agree to blood transfusions when needed. First, there is no indication that either child is in need of any medical attention or in need of a blood transfusion. Secondly, appellant further testified that she believes there are alternatives for blood transfusions the use of which for her daughters she would not find objectionable. Finally, the juvenile court has the jurisdiction to order a blood transfusion even over the objection of a parent. *Morrison v. State*, 252 S.W.2d 97 (Mo.App.1952).

Conclusion of Law Number 4(b) states that the affection of the children for their father and his rights to visitation and companionship would be alienated because of his alleged pagan activities and his belief in an allegedly false religion. This conclusion is against the weight of the evidence. Appellant testified that she would teach the girls to love and respect their father and that he could take the girls with him to do as he deemed appropriate concerning the celebration of his birthday and other similar activities. Respondent, however, testified that he would teach the girls that appellant was a member of a false and corrupt religion. Further, respondent's rights of visitation would be no worse and in fact would be better protected than are those of appellant now. By its decree the trial court permitted the respondent to remove the girls from Jackson County (home of appellant) to Schell City, some one hundred miles away, knowing that appellant had no relia-

ble transportation. Similarly, Conclusion of Law Number 4(c) expresses concern for the girls' association with other members of the family, *i. e.*, grandparents, were they to live with their mother. But the paternal grandparents' gain in Schell City is the maternal grandparents' loss from Jackson County. It is difficult to see how these questions as to grandparents resolve themselves in anything but an equal balance.

Conclusion of Law Number 4(d) and (e) and 7 are mere normative generalizations not supported by any evidence in the record.

Respondent has been drifting from job to job, having been employed in at least four different jobs during the last five years. He was asked to leave his job with the Grandview police department after being involved with the sale of beer to minors and was placed on probation at the Blue Springs police department as a result of having threatened appellant's life with his police revolver which threat was made in the presence of the older daughter. Uncontroverted evidence showed that respondent had offered and given alcoholic beverages to the older daughter (now not yet 4 years old). Respondent kept his own religious literature in the family home and like appellant, engaged in door-to-door preaching for his own religious persuasion.

We have carefully considered the whole record before us and readily conclude that the trial court's reason for awarding the custody of the children to the father was the religious persuasion of the mother. Now reviewing the record to the exclusion of the religious tenets of the mother, we do not find evidence that would support a finding that the best interests of these children would be served by their custody being awarded to their father.

We therefore reverse the decree of the trial court respecting the custody of these children and direct that the care, custody and control be placed with the mother forthwith.

Beyond the Best Interests of the Child (1973); M. Green, Fathering (1976); J. Levine, Who Will Raise the Children (1976), and underscore

the fact that our disposition of this case is justly and fairly accomplished without the benefit of any presumption.

The trial court is directed to enter its order accordingly. The trial court is also directed promptly to conduct a further hearing, upon notice to the parties and with opportunity to present further evidence if desired, to determine the amount to be paid appellant by respondent for the support of said children and further to provide for visitation rights and privileges of respondent at reasonable times and places and for allowances of reasonable attorney's fees.

FINCH and DONNELLY, JJ., and HOUSER, Special Judge, concur.

BARDGETT, J., concurs in result in concurring opinion filed.

MORGAN, C. J., and RENDLEN, J., concur in result and concur in concurring opinion of BARDGETT, J.

BARDGETT, Judge, concurring in result.

I concur in the result reached by the principal opinion because all facts (*including those pertaining to religion*) being considered causes me to be of the firm conviction that the trial court was wrong. The findings and conclusions of the trial court convince me that the trial court concluded that the members of the Jehovah's Witnesses religion, as a class and because of the tenets of that faith, are unfit to have custody of children, and on that basis denied custody of the children to the mother and awarded it to the father.

However, I disagree with the statement in the majority opinion which appears to foreclose any inquiry into religious beliefs. If religious training or beliefs and practices are not material to the particular point in issue, then, of course, there should be no inquiry into the matter. However, it is impossible to predict what will or will not be relevant when the subject is a domestic dispute and custody of the couple's children, and the best interest of the children is the criteria for decision. The family relationship is a very close one. Some matters are vitally important to one family and totally unimportant to another. The principal opinion quotes with approval from *Stone v. Stone,* 16 Wash.2d 315, 133 P.2d 526 (1943),

in part, stating, " . . . but so far as appears *from the testimony* in this case, the teachings of Jehovah's Witnesses cannot, in our opinion, be classed in any one of these categories." (Emphasis mine.)

The Washington court could not have made that statement or reached that conclusion (with which I agree) without there having been *evidence* as to the teachings and tenets of the Jehovah's Witnesses religion. That case, therefore, does not stand for the proposition that inquiry as to religious beliefs is foreclosed by the separation of church and state constitutional provisions, but rather for the proposition that the inquiry, when relevant to an issue can and should be made.

The principal opinion says that inquiry into religious beliefs is permissible if the question is whether a parent's religious beliefs are such that he would refuse to send the child to a school class where evolution is taught. I agree that the inquiry may be relevant in a given case, but why the exception with respect to evolution. This is probably only an example but evidences a value judgment as to a particular religious belief and it points up the fact that we should not foreclose inquiry because to do so is to impose ignorance of material facts on the court. What if a parent—maybe both parents—believe the World was created as set forth in Genesis and that belief is a tenet of the faith they espouse? If they answer the inquiry on evolution as set forth in the principal opinion in the affirmative, does that mean they are unfit and the state should divest them of custody of their children? I don't think so. The point is that the principal opinion seems to recognize that inquiry, *per se,* into *some* religious beliefs is authorized but not others. However, I do not think that judges and lawyers can know which is foreclosed and which is not. The admission of evidence should be governed by the usual evidentiary rules, not arbitrary barriers.

Two recent cases which apply the rule of impartiality between or with respect to religion in child custody matters are *Munoz v. Munoz,* 79 Wash.2d 810, 489 P.2d 1133 (banc

1971), and *Robertson v. Robertson*, 19 Wash.App. 425, 575 P.2d 1092 (1978). It is seen that these cases allowed evidence to be received respecting religious beliefs in order to resolve the issue as to what would serve the best interests of the children; that is, whether attendance at different churches (one with the mother and another with the father) and conflicting religious tenets would cause harm to the children. In both cases the courts held the children's general welfare would not be harmed. Again, however, the court *received the evidence* in order to decide the issues. I believe it is not sound to expect the right result under the constitution and laws to be reached by *forbidding* a trial court to hear evidence on matters that are obviously of importance to the litigants and to the welfare of the children. To mandate such a procedure encourages those who wish to conceal relevant and material matters to do so under the guise of "religious beliefs". Nor is it conducive to correct decisions to mandate a barrier against evidence for fear the trial court will act in violation of the constitution if he hears the evidence.

The trial court must, and in my opinion constitutionally can receive evidence upon all those matters touching upon the rearing of children, including religious beliefs or practices, in order for the trial court to perform its function of acting in the best interests of the child.

This court has now said, and the trial courts now know they cannot favor or disfavor one religion over another, as such, nor can a judge's personal evaluation of the propriety of certain religious beliefs form the basis for awarding custody of children. That, in my opinion, is sufficient to decide this case. I would not arbitrarily cut off inquiry into what may be an important area in a future child custody case and thereby require the judge to act in ignorance of relevant facts.